UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Midwest Sign & Screen Printing Supply
Co.,

              Plaintiff,

v.

Robert Dalpe and Laird Plastics, Inc.,

              Defendants.

Civil File No. _____

**COMPLAINT**

---

Plaintiff Midwest Sign & Screen Printing Supply Co., for its Complaint in this matter, hereby states as follows:

## OVERVIEW OF THE ACTION

1.     This action seeks to remedy substantial and ongoing harm sustained by Plaintiff, Midwest Sign & Screen Printing Supply Co. ("Midwest") to its sign and screen printing supply business as the result of numerous illegal and improper actions taken by Defendants Robert Dalpe ("Dalpe") and Laird Plastics, Inc. ("Laird") (collectively, "Defendants").

2.     Dalpe was employed by Midwest from July 18, 2011 through March 8, 2019 in various high-level client-facing sales and operations management positions.

3.     During his employment with Midwest, Dalpe was intimately involved in managing the operations of the company and building direct customer relationships first at its Hayward, California branch as its Operations Manager, and later at its Portland, Oregon

1

151874499.1

and Seattle, Washington branches as its Northwest Sales Manager. As a result, Dalpe obtained valuable confidential, proprietary and trade secret information belonging to Midwest regarding its customers, potential customers, its pricing strategy, suppliers, operations and its employees.

4. In consideration for his 2015 promotion to the Northwest Sales Manager position, Dalpe entered into a noncompetition, nonsolicitation, and confidentiality agreement with Midwest, whereby he agreed to, among other restrictions, not compete with Midwest, not to solicit Midwest's customers or employees, and not to disclose or misappropriate Midwest's confidential, proprietary, or trade secret information.

5. On or around February 25, 2019, Dalpe gave Midwest notice that he was resigning his employment with Midwest effective March 8, 2019. He informed Midwest he had accepted employment with Laird, one of Midwest's direct competitors, and that he intended to work in the same geographic area in which he had worked for Midwest. Such employment is a direct violation of the noncompetition provision.

6. In the months leading up to his resignation, unbeknownst to Midwest at the time, Dalpe accessed Midwest's confidential information, including but not limited to, extensive customer lists including product purchase and sales data, revenue reports, and internal meeting agendas and he emailed the confidential information from his Midwest e-mail account to his own personal e-mail account, which is a direct violation of the confidentiality provision and violates Midwest's written employment policy protecting its confidential and trade secret information.

7. Three days after Dalpe gave his notice of resignation, Midwest—through

2

counsel—apprised Laird of Dalpe's post-employment obligations that would prohibit Dalpe from performing work for a competitor of Midwest, sought assurances from Laird that it would not interfere in Dalpe's obligations to Midwest, and requested clarification from Laird as to what Dalpe's intended job duties would be. The same notice and requests were made of Dalpe through Midwest's counsel.

8.      Instead of abiding by the non-competition, non-solicitation and confidentiality covenants, Dalpe began working for Laird in the capacity of General Manager of Laird's Portland, Oregon branch location. Despite its knowledge of the non-competition, non-solicitation and confidentiality covenants that Dalpe is bound by, Laird knowingly retained Dalpe's services.

9.      By letter dated March 13, 2019, Midwest, through counsel, again communicated to Laird the grave concerns it had with the fact that Laird was seemingly choosing to continue to employ Dalpe in knowing violation of Dalpe's agreement with Midwest.

10.     In this same March 13, 2019 letter, Midwest advised Laird that it had discovered that Dalpe had sent substantial amounts of Midwest's confidential and trade secret information to his own personal e-mail account without authorization shortly before his employment with Midwest ended. Midwest asked for reasonable assurances that the information would be returned, and that Dalpe's devices be turned over to Midwest for investigation.

11.     To date, Laird has refused to honor Midwest's restrictive covenants with Dalpe or provide the requested assurances, leaving Midwest with no choice but to initiate

3

this lawsuit and draw conclusions as to Laird and Dalpe's intentions with regard to Dalpe's prohibited competition and the converted and misappropriated confidential and trade secret information.

## PARTIES, JURISDICTION, AND VENUE

12.     Midwest is a corporation under the laws of the State of Minnesota with its principal place of business located in St. Paul, Ramsey County, Minnesota.  Midwest's primary business is to help companies in the screen printing, digital printing, and sign industries grow their business by offering general consultation services, digital printer repair and maintenance services, selection consultation and delivery of products including, but not limited to, acrylics, Alucobond, Dibond, Gatorfoam, Sintra, foamboard, styrene, banner, and most rigid and flexible industry substrates.  Russ May is Midwest's President and Chief Operating Officer, Pete Weinberg is Midwest's Vice President of Sales, and Wendy Froelke is Midwest's Director of Human Resources.

13.     Defendant Dalpe is a former employee of Midwest.  Upon information and belief, Dalpe is a resident and a citizen of Lake Oswego, Clackamas County, Oregon.

14.     Defendant Laird is a corporation under the laws of the State of Delaware, with its principal place of business located in Irving, Dallas County, Texas.

15.     The citizenship of Plaintiff Midwest is entirely diverse from the citizenship of both Defendants, and the matter in controversy herein exceeds $75,000, exclusive of interest and costs.  This Court therefore has jurisdiction over the parties and the subject matter of this action as provided by 29 U.S.C. § 1332. Defendant Dalpe has also consented to the exercise of personal jurisdiction by this Court.

16.     Plaintiff has brought a claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; therefore, this Court also has original jurisdiction over the matter as arising under the laws of the United States as provided by 29 U.S.C. § 1331, and this Court has supplemental jurisdiction over Plaintiff's remaining claims against Defendant in this matter as they are related and form part of the same case or controversy as the DTSA claim pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Midwest's principal place of business is in this district and a substantial part of the events giving rise to the claim occurred within this district.

## FACTUAL ALLEGATIONS

### Dalpe's Involvement with Midwest

18.     On or around June 29, 2011, Midwest hired Defendant Dalpe as its Operations Manager at Midwest's Hayward, California branch location.

19.     The initial terms and conditions of Dalpe's employment with Midwest were outlined in an offer letter dated June 28, 2011 ("Offer Letter"), which was later signed and accepted by Mr. Dalpe on June 29, 2011.

20.     The offer of employment in the Offer Letter was made contingent on Dalpe's successful completion of a background check and it was contingent on Dalpe signing a Confidentiality, Nonsolicitation, and Noncompetition Agreement ("2011 Agreement"), a copy of which was enclosed with the Offer Letter.

21.     Dalpe signed the 2011 Agreement on June 29, 2011, which included the following relevant portions of a noncompetition and nonsolicitation covenant:

151874499.1

4.   During my employment with you, I will devote my full time and energy to furthering your business and I will not become affiliated in any capacity with any individual or entities who are competing or planning to compete with you at that time.

5.   For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not own, work for or assist any entity that offers products or services that compete with products or services that you offer.

6.   For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not provide products or services that compete with yours to any entity who was a customer of yours during my employment with you.

7.   I will not, during the term of my employment or for a period of 12 months following the termination of my employment, directly or indirectly hire or attempt to hire any of your employees or independent contractors, or otherwise attempt to induce them to leave their employment with you.

8.   I will provide a copy of this agreement to any employer with whom I interview or accept employment within 12months of the termination of my employment with you.  I agree and acknowledge that the restrictions contained in this Agreement shall survive the termination of my employment with you.

22.   In addition, the 2011 Agreement contained the following provision regarding the nondisclosure of confidential information:

1.   "Confidential information" means any information not generally known by third parties, including your competitors or the general public.  It includes (but is not limited to) information about your customers, compensation, products and finances.  I will treat information that is not expressly identified as "confidential" as confidential if, under the circumstances, I know or have reason to know that you intend to keep that type of information confidential.

151874499.1

2. I will not, during or after my employment, disclose your confidential information to any other person or entity, or use your confidential information for my own benefit or for the benefit of another, unless you expressly direct me to do so.

23.     In consideration for signing the 2011 Agreement, Dalpe was offered, and accepted, employment with Midwest as its Operations Manager position with an annual base salary, profit sharing, and a Corporate Margin Goal Bonus Program, and other benefits described in the Offer Letter.

24.     Dalpe accepted the terms of the Offer Letter and signed both the Offer Letter and the 2011 Agreement on or around June 29, 2011.

25.     The 2011 Agreement allowed Midwest to seek injunctive relief and/or any other remedy allowed by law and collect from Dalpe reasonable attorneys' fees and costs incurred in enforcing the terms of the 2011 Agreement.

26.     Over the next several years, Dalpe remained employed by Midwest in the Operations Manager position where his responsibilities included, but were not limited to, overall management of the Hayward, California Operations including management of the warehouse, inventory, will call, delivery, and customer support.

27.     Dalpe's base salary compensation increased between 2%-10% each year of his employment with Midwest.

28.     Dalpe remained in the Operations Manager position from 2011 until April 2015, when Midwest offered, and Dalpe accepted, a promotion to the Northwest Sales Manager position.

29.     On or around April 16, 2015, Midwest offered Dalpe this promotion to

151874499.1

Northwest Sales Manager, which would require him to move to Portland, Oregon ("2015 Promotion Offer"), and Midwest paid for Dalpe's approved moving expenses.

30.   The 2015 Promotion Offer was contingent upon Dalpe signing a Confidentiality, Nonsolicitation, and Noncompetition Agreement (the "2015 Agreement"), a copy of which was enclosed with the 2015 Promotion Offer.

31.   The 2015 Agreement included the following relevant portions of a noncompetition and nonsolicitation covenant:

> 4.   During my employment with you, I will devote my full time and energy to furthering your business and I will not become affiliated in any capacity with any individual or entities competing or planning to compete with you at that time.
>
> 5.   For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not own, work for or assist any entity that offers products or services that compete with products or services that you offer.
>
> 6.   For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not provide products or services that compete with yours to any entity who was a customer of yours during my employment with you.
>
> 7.   I will not, during the term of my employment or for a period of 12 months following the termination of my employment, directly or indirectly hire or attempt to hire any of your employees or independent contractors, or otherwise attempt to induce them to leave their employment with you.
>
> 8.   I will provide a copy of this agreement to any employer with whom I interview or accept employment within 12 months of the termination of my employment with you. I agree and acknowledge that the restrictions contained in this Agreement shall survive the termination of my employment.

151874499.1

32.     In addition, the 2015 Agreement contained the following provision regarding the nondisclosure of confidential information:

    1.   "Confidential information" means any information not generally known by third parties, including your competitors or the general public. It includes (but is not limited to) information about your customers, compensation, products and finances. I will treat information that is not expressly identified as "confidential" as confidential if, under the circumstances, I know or have reason to know that you intend to keep that type of information confidential.

    2.   I will not, during or after the term of my employment, disclose your confidential information to any other person or entity, or use your confidential information for my own benefit or for the benefit of another, unless you expressly direct me to do so.

33.     In consideration for signing the 2015 Agreement, Dalpe was offered, and accepted, the 2015 Promotion Offer, the result of which Midwest increased Dalpe's base salary compensation by 14.26 percent.

34.     In addition to an increase in his base salary compensation, as a result of accepting 2015 Promotion Offer and signing the 2015 Agreement, Dalpe became eligible for the Sales Management Bonus Program and the sales vehicle program.

35.     The Northwest Sales Manager position resulted in an increase in responsibility within the Midwest Organization including, but not limited to: oversight of two branches (Portland, Oregon and Seattle, Washington) and an increased focus on market and sales growth within the branch geographic areas covering the Pacific Northwest, which included all of Oregon, all of Washington, and portions of Idaho, Alaska, and British Columbia (the "Pacific Northwest").

151874499.1

36. As the Northwest Sales Manager, Dalpe represented Midwest to both existing and prospective customers at seminars and trade shows in the region.

37. As the Northwest Sales Manager, Dalpe met with and had regular contact with Midwest existing and prospective customers both in person and by phone and electronic communications.

38. Dalpe acknowledged in the 2015 Agreement "that as part of [his] duties [he] will develop and maintain close working relationships with [Midwest's] customers," and he agreed that Midwest has "expended significant time and money on the development of customer goodwill and a sound business reputation." He further agreed that "any unauthorized use or disclosure of [Midwest's] confidential information, or any violation of [Dalpe's] obligation not to solicit [Midwest's] customers or employees or compete with [Midwest], would seriously harm [Midwest's] business and cause monetary loss that would be difficult, if not impossible, to measure."

39. Midwest invested resources and time in fostering Dalpe's professional growth (e.g., sales conference attendance, annual trade shows, 3M training, Union Ink training, and The Kahle Way Sales Management Training in Chicago), and the process of developing and maintaining close working relationships with Midwest's customers in the Pacific Northwest was gradual and occurred over a period of several years throughout his tenure in the Northwest Sales Manager role.

40. As the Northwest Sales Manager, Dalpe had knowledge of Midwest's products and pricing and would regularly review and approve existing and prospective customer pricing quotes and proposals.

151874499.1

41.     As the Northwest Sales Manager, Dalpe managed approximately five sales representatives.  He often participated in joint sales calls with the sales representatives to both existing and prospective customers, and he developed sales and general strategy for both customers and prospects.

42.     As the Northwest Sales Manager, Dalpe was intimately involved with the overall strategy and operations of Midwest at its Portland and Seattle branch locations and surrounding service areas, and obtained valuable confidential, proprietary, and trade secret information regarding customer lists; customer preferences; customer and company pricing and pricing strategies; financial results including sales revenues and profits by customer; sales representative and other employee compensation data; employee information, generally; Midwest product strategy; vendor information and pricing related to the same; and other proprietary information that is not generally known by third parties.

43.     Dalpe was also privy to and participated in weekly calls with his manager, the Vice President of Sales, and his five counterpart sales managers from Midwest's other sales territories, during which confidential and sensitive information was discussed including, but not limited to, product announcements, key customer sales strategies, overall Midwest sales strategies for all of Midwest's regions, and individual sales representative performance.

44.     On or around February 25, 2019, Dalpe notified Midwest, through his manager, Pete Weinberg, that he was resigning his employment effective March 8, 2019.

45.     The covenants and restrictions contained in the 2015 Agreement are intended to protect Midwest's confidential, proprietary, and trade secret information and Midwest

11

requires employees in key sales and management positions to sign similar agreements in a good-faith effort to protect this information.

### Dalpe Leaves Midwest to Work for a Competitor
### in Violation of the Noncompetition Provision

46.     On or around the same day Dalpe resigned his employment with Midwest, February 25, 2019, he notified Midwest that he was offered employment with Defendant Laird and that he intended to begin his employment with Laird after his resignation effective date, March 8, 2019.

47.     Laird is a multi-national organization offering services to customers across North America, including in the Pacific Northwest.

48.     Among other product areas, Laird representatives consult with their customers on the application of and they provide signage products and services, including products and services similar to Midwest's offerings such as acrylics, Alucobond, Dibond, Gatorfoam, Sintra, Foamboard, Styrene, Banner, and most rigid and flexible industry substrates.

49.     Laird offers products and services that compete with the products and services Midwest offers.

50.     After Dalpe left Midwest's employ, he began working for Midwest's direct competitor, Laird, at Laird's Portland, Oregon location, approximately six (6) miles away from Midwest's Portland branch location.

51.     As the General Manager of Laird's Portland, Oregon location, Dalpe has and will continue to—directly or indirectly—provide products or services that compete with

151874499.1

Midwest's products or services to entities that were (or are) customers of Midwest during Dalpe's employment at Midwest.

52.     Upon information and belief, Laird hired Dalpe because of his extensive background in plastic distribution at Midwest, which is the same or similar distribution services for which he was hired to perform and/or manage at Laird and, in fact, Laird touted this advantage in its public announcement of Dalpe's hiring.

53.     As of the date of the filing of this Complaint, Dalpe remains currently employed at Laird as its General Manager of the Portland branch location.

54.     Dalpe's employment with Laird violates the 2015 Agreement.

### Dalpe Took Midwest's Confidential and Trade Secret Information Without Authorization in Violation of the 2015 Agreement and Midwest Employment Policies

55.     In the ordinary course of its business, Midwest creates lists and reports of its customers and its customers' associated revenues and sales data.  Such compilations of data are developed by Midwest over time and through substantial effort, are kept in confidence, and are not otherwise readily ascertainable by third parties, and in particular, knowledge related to Midwest's customers' annual sales revenues and purchasing patterns is not generally known within the industry or the general public outside of Midwest.

56.     Prior to his departure from Midwest, Dalpe surreptitiously took confidential, proprietary, and trade secret information (the "Converted Information") from Midwest by emailing the Converted Information from his Midwest e-mail account to a personal e-mail address over the course of approximately two months leading up to his resignation.

57.     Midwest learned of Dalpe's improper removal of the Converted Information

151874499.1

when it performed due diligence to protect the same once it learned Dalpe was going to work for a direct competitor, and it conducted a search on Dalpe's Midwest e-mail account.

58.     The Converted Information included, but is not limited to,

i.      Annual profit and loss statements for Midwest's Oregon territory for years ending 2016, 2017, and 2018;

ii.     Annual profit and loss statements for Midwest's Washington territory for years ending 2016, 2017, and 2018;

iii.    Annual profit and loss statements for Midwest's Pacific Northwest territory for years ending 2016 and 2017;

iv.     Midwest customer account lists containing customer name, customer phone number, Midwest sales representative identification number, customer state and zip code, and amount of prior year sales revenue by customer for over 2,700 Midwest customers, as well as lists containing product purchase detail;

v.      Daily margin reports for years ending 2015, 2016, 2017, and 2018, each of which contains information including, but not limited to, daily margin data broken down by all ten states in which Midwest maintains a branch location, daily margin data broken down by product/service category, projections and budget forecasts for daily margin, daily margin data for all ten states comparing budgeted margin versus actual margin;

vi.     Copy of offer letter and employment agreement for a different Midwest sales represent who Dalpe recently hired prior to his resignation; and

vii.    Internal Midwest meeting agenda for Dalpe's sales team, containing information

about:  product announcements, sales representative individual performance metrics, key customer strategies and updates, and a spreadsheet containing customer names corresponding to specific product preferences/purchases/margins.

59.    Upon information and belief, Dalpe's explanation for removing Midwest's confidential and trade secret information without authorization is that he wanted to verify he would receive his correct commission amount in March 2019.   However, as demonstrated above, the numerous profit and loss statements for prior years, customer lists, offer letters to an employee other than himself, and other data, have nothing to do with Dalpe's compensation calculation or verification of the same.

60.    In addition to asking employees, like Dalpe, to sign agreements similar to the 2015 Agreement, Midwest takes additional measures to protect its confidential and trade secret information including, but not limited to, restricting access to a need-to-know group of employees and adopting a general Confidential Information employment policy in its handbook that provides:

> Information is part of what makes this Company competitive. During your employment here, you will periodically learn sensitive information, either because you help to develop that information or because you need that information to do your job.  It is important for the health of this business—and for the well-being of employees who depend on this business for their livelihood—that you keep information you learn through your employment confidential.
>
> Confidential Information includes customer lists, business systems, strategies, plans, proposals, information on Midwest's processes, R&D data, financial and systems information, trade secrets, financial statements, and any other

151874499.1

information pertaining to the business of Midwest or any of its customers, consultants, licensees, or affiliates, and other information about Midwest's business that has value to Midwest because it is not generally known outside Midwest.

. . .

Except as part of your legitimate job duties for Midwest, you must not disclose or permit to be disclosed, either during or after your employment with Midwest, any Confidential Information to any person or entity for any reason. . . . An employee who improperly uses, removes, releases, or discloses Confidential Information may face disciplinary action, up to and including termination of employment. Employees who improperly disclose such information may also be subject to legal action.

61. The Converted Information is vital to Midwest's business and improperly removing and/or disclosing it, as Dalpe has, is a violation of the 2015 Agreement and a violation of Midwest's important employment policies.

62. The 2015 Agreement also provides:

3. If either you or I terminate my employment, I will deliver to you immediately all of your confidential information, in whatever format, and will not retain any copies.

63. Midwest's employee handbook contains the following provision in its Company Property policy:

Upon termination of employment, employees will be required to account for and surrender all company property and equipment he/she has been provided. Failure to do so would result in the Company taking legal action to obtain the return of its property.

64. Dalpe has received, and has acknowledged receipt of, Midwest's employee handbook.

65. As of the date of filing this Complaint, Dalpe has not returned, or certified

16

destruction, of any of Midwest's confidential information in his possession, custody, or control, which is a violation of the 2015 Agreement.

### Laird Is Aware Of Dalpe's Obligations Under the 2015 Agreement

66.     Midwest informed Mark Kramer, Chief Executive Officer of Laird, of Dalpe's obligations under the 2015 Agreement and requested Laird not to interfere with Dalpe's obligations under the 2015 Agreement.

67.     The 2015 Agreement states the following:

> 8. I will provide a copy of this agreement to any employer with whom I interview or accept employment within 12 months of the termination of my employment with you. I agree and acknowledge that the restrictions contained in this Agreement shall survive the termination of my employment.

68.     On or around the date Dalpe gave his notice of resignation to Midwest, Dalpe represented to his manager, Pete Weinberg, Vice President of Sales, that Dalpe informed Laird of his 2015 Agreement.

69.     Nevertheless, Dalpe remains employed as the General Manager of Laird's Portland, Oregon location in violation of Dalpe's 2015 Agreement with Midwest and despite numerous written requests from Midwest (through counsel), both Laird and Dalpe refuse to (i) provide even minimal written assurances that Dalpe has ceased accessing and has destroyed Midwest confidential information, including the Converted Information, (ii) provide a full written accounting of all of Midwest's data in Dalpe's possession, custody, or control, and state whether it has been disclosed in violation of the 2015 Agreement; (iii) turn over Dalpe's personal devices for Midwest's review or, alternatively, to turn over

Dalpe's personal devices to Laird's counsel for preservation; and (iv) postpone Dalpe's employment start-date until the matters identified in this Complaint could be resolved.

## COUNT I
## BREACH OF CONTRACT
## (DALPE)

70. Midwest restates and realleges the foregoing paragraphs of its Complaint.

71. Dalpe and Midwest are parties to the 2011 Agreement and the 2015 Agreement, each containing binding covenants and restrictions, and Dalpe executed and agreed to be bound by the 2011 Agreement and the 2015 Agreement.

72. The 2011 Agreement and the 2015 Agreement are each enforceable contracts.

73. Midwest did not waive any of the following agreements:  2011 Agreement or the 2015 Agreement.

74. The post-termination restrictions contained in the 2011 Agreement and the 2015 Agreement are supported by adequate consideration.

75. The post-termination restrictions contained in the 2011 Agreement and the 2015 Agreement are narrowly tailored and necessary to protect Midwest's legitimate business interests, including its customer relationships and confidential information.

76. The post-termination restrictions contained in the 2011 Agreement and the 2015 Agreement are reasonable in duration and scope, and Dalpe has never disputed the reasonableness of the covenants and restrictions.

77. Dalpe will or has violated the terms of the 2011 Agreement and/or the 2015

18

Agreement, including but not limited to the restrictions on competition, nonsolicitation, requirements relating to the return of Midwest property, and protection of confidential information by engaging in conduct during and after his employment with Midwest in blatant disregard of his obligations not to disclose confidential information or compete with Midwest for a reasonable period of time.

78.    Midwest has been, and will continue to be, damaged by Dalpe's breaches of the agreements set forth above.

79.    Midwest has been and will continue to be irreparably injured by Dalpe's breaches of the agreements set forth above, and is without a complete and adequate remedy at law.   Midwest is entitled to injunctive relief requiring Dalpe to comply with the agreement set forth above and preventing future harm caused by Dalpe's breaches.

80.    As a direct and proximate result of Dalpe's breach of the 2011 Agreement and/or the 2015 Agreement, Midwest has also suffered damages in excess of $75,000, to be proven with specificity at trial.

**COUNT II**
**VIOLATION OF APPLICABLE STATE TRADE SECRET ACTS**
**(DALPE AND LAIRD)**

81.    Midwest restates and realleges the foregoing paragraphs of its Complaint.

82.    Dalpe was exposed to Midwest's confidential, proprietary and trade secret information while employed by Midwest, including, but not limited to, its pricing methods and strategies and formulas for current and prospective customers, compilation of customer data including lists and reports of its customers and its customers' associated revenues and sales data.   Such compilations of data are developed by Midwest over time and through

19

substantial effort, are kept in confidence, and are not otherwise readily ascertainable by third parties, and in particular, knowledge related to Midwest's customers' annual sales revenues and purchasing patterns is not generally known within the industry or the general public outside of Midwest.

83.     Midwest's confidential, proprietary and trade secret information derives independent economic value from not being generally known to others, or not being readily ascertainable through proper means by others.

84.     Dalpe owed a duty to Midwest to maintain the secrecy of Midwest's confidential, proprietary and trade secret information and material, and he was aware of this duty both during and after his employment with Midwest.

85.     Laird knows or has reason to know that Dalpe acquired Midwest confidential, proprietary, and trade secret information by improper means, and Laird has a duty not to appropriate such information.

86.     Midwest has taken reasonable steps to safeguard its confidential, proprietary, and trade secret information.

87.     Dalpe and Laird have used, and will inevitably use and/or disclose, Midwest's confidential, proprietary and trade secret information.  Midwest did not consent to Laird's and Dalpe's acquisition, misappropriation, disclosure, or use of Midwest's confidential, proprietary and trade secret information.

88.     Dalpe has violated applicable state laws regarding the protection of trade secrets, including the Washington Uniform Trade Secrets Act, RCW § 19.108, the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01 et seq., and/or the Oregon

Uniform Trade Secret Act, ORS § 646.471 et seq., through his misappropriation of confidential, proprietary and trade secret information and materials belonging to Midwest, and through his acquisition of the information by improper means, and his use of the information and materials for his own benefit and the benefit of others. Further, certain misappropriations were made on behalf of Laird, and within Dalpe's scope of his agency and/or employment with Laird and/or with Laird's knowledge and consent. Thus, Dalpe's actions are attributable to Laird.

89.     Laird has violated the Washington Uniform Trade Secrets Act, RCW § 19.108, the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01 et seq., and/or the Oregon Uniform Trade Secret Act, ORS § 646.471 et seq., through its misappropriation and use of confidential, proprietary, and trade secret information and materials belonging to Midwest for its own benefit, knowing or having reason to know that such information and materials were acquired through improper means, or knowing or having reason to know that such information and materials were derived from or through a person who owed a duty to Midwest to maintain its secrecy or limit its use.

90.     As a direct and proximate result of Laird and Dalpe's violation of the Washington Uniform Trade Secrets Act, RCW § 19.108, the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01 et seq., and/or the Oregon Uniform Trade Secret Act, ORS § 646.471 et seq., Midwest is suffering immediate and irreparable injury, harm and damage, and will continue to suffer injury, harm and damage and is thereby entitled to injunctive relief requiring Laird and Dalpe to return Midwest's confidential, proprietary, and trade secret information and materials and prohibiting further possession, use and

disclosure by them of such information, and preventing future harm caused by their violations.

91.     Dalpe's and Laird's misappropriations of trade secret information was willful, malicious, and reckless.

92.     Also as a direct and proximate result of Dalpe and Laird's violation of the Washington Uniform Trade Secrets Act, RCW § 19.108, the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01 et seq., and/or the Oregon Uniform Trade Secret Act, ORS § 646.471 et seq., Midwest is entitled to attorneys' fees, compensatory damages and exemplary damages in an amount greater than $75,000 to be proven with specificity at trial.

**COUNT III**
**VIOLATION OF DEFEND TRADE SECRETS ACT**
**(18 U.S.C. § 1836 ("DTSA"))**
**(DALPE AND LAIRD)**

93.     Midwest restates and realleges the foregoing paragraphs of its Complaint.

94.     Dalpe was exposed to Midwest's confidential, proprietary and trade secret information while employed by Midwest, including, but not limited to, its pricing methods and strategies and formulas for current and prospective customers, compilation of customer data including lists and reports of its customers and its customers' associated revenues and sales data. Such compilations of data are developed by Midwest over time and through substantial effort, are kept in confidence, and are not otherwise readily ascertainable by third parties, and in particular, knowledge related to Midwest's customers' annual sales revenues and purchasing patterns is not generally known within the industry or the general public outside of Midwest.

151874499.1

95.    Midwest's confidential, proprietary and trade secret information derives independent economic value from not being generally known to others, or not being readily ascertainable through proper means by others.

96.    Dalpe owed a duty to Midwest to maintain the secrecy of Midwest's confidential, proprietary and trade secret information and material, and he was aware of this duty both during and after his employment with Midwest.

97.    Laird knows or has reason to know that Dalpe acquired Midwest confidential, proprietary, and trade secret information by improper means, and Laird has a duty not to appropriate such information.

98.    Midwest has taken reasonable steps to safeguard its confidential, proprietary, and trade secret information.

99.    Dalpe and Laird have used, and will inevitably use and/or disclose, Midwest's confidential, proprietary and trade secret information.  Midwest did not consent to Laird's and Dalpe's acquisition, misappropriation, disclosure, or use of Midwest's confidential, proprietary and trade secret information.

100.    Midwest restates and realleges the foregoing paragraphs of its Complaint.

101.    Dalpe was exposed to Midwest's confidential, proprietary and trade secret information while employed by Midwest, including, but not limited to, its customer lists, the scheduled inspections for its customers, its pricing information and forms/procedures used to run its business.

102.    Midwest's confidential, proprietary and trade secret information derives independent economic value from not being generally known to others, or not being readily

23

ascertainable through proper means by others.

103.    Dalpe owed a duty to Midwest to maintain the secrecy of Midwest's confidential, proprietary and trade secret information and material.  Laird has a duty not to appropriate such information.

104.    Midwest has taken reasonable steps to safeguard its confidential and proprietary information.

105.    Dalpe and Laird have used, and will inevitably use and/or disclose, Midwest's confidential, proprietary and trade secret information.  Midwest did not consent to Laird's and Dalpe's misappropriation, disclosure, and use of Midwest's confidential, proprietary and trade secret information.

106.    Dalpe has violated DTSA, 18 U.S.C. § 1836, through his misappropriation and use of confidential, proprietary and trade secret information and materials belonging to Midwest, and through his acquisition of the information by improper means, and his use of the information and materials for his own benefit and the benefit of others.  Further, certain misappropriations were made on behalf of Laird, and within Dalpe's scope of his agency and/or employment with Laird and/or with Laird's knowledge and consent.  Thus, Dalpe's actions are attributable to Laird.

107.    Laird has violated DTSA, 18 U.S.C. § 1836, through its misappropriation and use of confidential, proprietary, and trade secret information and materials belonging to Midwest for its own benefit, knowing or having reason to know that such information and materials were acquired through improper means, or knowing or having reason to know that such information and materials were derived from or through a person who owed

151874499.1

a duty to Midwest to maintain its secrecy or limit its use.

108.    As a direct and proximate result of Laird and Dalpe's violation of DTSA, Midwest is suffering immediate and irreparable injury, harm and damage, and will continue to suffer injury, harm and damage and is thereby entitled to injunctive relief requiring Laird and Dalpe to return Midwest's confidential, proprietary, and trade secret information and materials and prohibiting further possession, use and disclosure by them of such information, and preventing future harm caused by their violations.

109.    Dalpe's and Laird's misappropriations of trade secret information was willful, malicious, and reckless.

110.    Also as a direct and proximate result of Dalpe and Laird's violation of DTSA, Midwest is entitled to attorneys' fees, compensatory damages and exemplary damages in an amount greater than $75,000 to be proven with specificity at trial.

**COUNT IV**
**BREACH OF DUTY OF LOYALTY**
**(DALPE)**

111.    Midwest restates and realleges the foregoing paragraphs.

112.    As an employee of Midwest, Dalpe owed a duty of loyalty to Midwest.

113.    While employed by Midwest, Dalpe unlawfully and surreptitiously removed Midwest's confidential, proprietary, and trade secret information with the intention of diverting to himself and/or Laird, Midwest's customers, accounts, confidential information, and business.

114.    Dalpe's acts and omissions, as set forth herein and elsewhere in this Complaint, constitute breaches of his duty of loyalty to Midwest.

151874499.1

115.    Midwest has been, and will continue to be, damaged by Dalpe's breach of his duty of loyalty.

116.    Midwest will be or has been irreparably injured by Dalpe's breach of his duty of loyalty, and is without a complete and adequate remedy at law.

117.    Dalpe must be enjoined from continued breaches of his duty of loyalty.

118.    Dalpe must also pay damages in an amount exceeding $75,000 to be determined with specificity at trial, relative to this breach of his duty of loyalty.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
## (LAIRD)

119.    Midwest restates and realleges the foregoing paragraphs of its Complaint.

120.    Laird knows that Dalpe has non-competition, non-solicitation and non-disclosure restrictions in the form of his 2015 Agreement with Midwest.

121.    Laird has procured the breach of the 2015 Agreement intentionally and without justification.

122.    As a result of the procurement of contractual breaches, Midwest suffered, and will continue to suffer, irreparable harm.

123.    To remedy this tortious interference, Laird must be enjoined from procuring or facilitating Dalpe's continued breaches of his agreements.  Laird must also pay damages in an amount greater than $75,000 to be determined at trial, including but not limited to Midwest's attorneys' fees to enforce Dalpe's agreements.

26

151874499.1

## COUNT VI
## UNFAIR COMPETITION
## (DALPE AND LAIRD)

124.    Midwest restates and realleges the foregoing paragraphs of its Complaint.

125.    Defendants' tortious interference with Midwest's contractual relationships; misappropriation of confidential, proprietary, and trade secret information from Midwest; and their use of such information to the detriment of Midwest, as described above, constitute unfair competition in violation of the common law.

126.    Defendants' unfair competition has damaged or will cause damage to Midwest, which has suffered, and will continue to suffer, irreparable harm that justifies enjoining Defendants from their illegal and improper actions, plus attorneys' fees and damages from Defendants in an amount greater than $75,000 to be proven with specificity at trial.

## COUNT VII
## AIDING AND ABETTING
## (DALPE AND LAIRD)

127.    Midwest restates and realleges the foregoing paragraphs.

128.    Defendants, individually and collectively, aided and abetted the other's wrongful conduct towards Midwest, including but not limited to their misappropriation of information and their tortious interference with Midwest's business relations and prospective contractual and/or business relations.

129.    Defendants are, therefore, jointly and severally liable for such aiding and abetting.

130.    Midwest has been, and will continue to be, damaged by Defendants' aiding

151874499.1

and abetting.

131.    Midwest will or has been irreparably injured by Defendants' aiding and abetting and is without a complete and adequate remedy at law.

132.    Defendants' must be enjoined from continued aiding and abetting.

133.    Defendants must also pay damages in an amount greater than $75,000 to be determined with specificity at trial relative to this aiding and abetting.


**WHEREFORE**, Midwest prays that this Court enter judgment in its favor and against Defendants Dalpe and Laird:

1.    Enjoining Dalpe from violating the terms of his 2015 Confidentiality, Nonsolicitation and Noncompetition Agreement (the "2015 Agreement");

2.    Enjoining Dalpe from working for or assisting Laird in any capacity that competes with Midwest in violation of the 2015 Agreement;

3.    Enjoining Dalpe from providing products or services to any entity that was a customer of Midwest's during his employment with Midwest;

4.    Enjoining Laird from procuring and/or aiding Defendant Dalpe's breach of the 2015 Agreement;

5.    Enjoining Defendants from maintaining, using or disclosing any confidential or trade secret information belonging to Midwest.

6.    Ordering Defendants to produce to Midwest all devices (including computers, hard drives, smartphones, and/or other electronic storage devices) and

151874499.1

credentials for all accounts where Midwest confidential or trade secret information has or does reside for purposes of forensic examination by Midwest at Defendants' expense.

7.     Enjoining Defendants, until forensic copies or similar replicas are created pursuant to the preceding paragraph, from deleting, destroying, changing or otherwise altering the electronic devices/computers described in the preceding paragraph.

8.     Ordering that Midwest not be required to post a bond.

9.     Awarding Midwest its reasonable attorneys' fees for bringing this motion pursuant to the 2015 Agreement, Minn. Stat. § 325C.04, 18 U.S.C. § 1836(b)(3)(D), the Minnesota Supreme Court's decision in *Kallok v. Medtronic*, 573 N.W.2d 356 (Minn. 1998), and/or other applicable authority.   Ordering Midwest to submit an affidavit in support of its request for attorneys' fees within 14 days of this Order.

10.     Awarding Midwest pre- and post-judgment interest, costs and disbursements as permitted by law, and all other relief that the Court deems just and equitable.


Dated: April 8, 2019

Daniel Oberdorfer (#0233791)
Nicole L. Faulkner (#0397456)
Stinson Leonard Street LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN  55402
612.335.1500
Dan.oberdorfer@stinson.com
Nicole.faulkner@stinson.com

**ATTORNEYS FOR PLAINTIFF**