UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Midwest Sign & Screen Printing Supply Co., | Court File No. 19-CV-000967 (ECT/SER) |
| Plaintiff, | **DEFENDANTS LAIRD PLASTICS, INC. AND ROBERT DALPE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| Robert Dalpe and Laird Plastics, Inc., | |
| Defendants. | |

## <u>INTRODUCTION</u>

Don't believe the hype – this is not a case in which a company faces significant lost profits because a former employee absconded with confidential information to work for a competitor. Despite the fact that Plaintiff Midwest Sign & Screen Printing Supply Co. ("Midwest") has purported to allege claims of breach of contract, tortious interference, and misappropriation of trade secrets, this is not an open and shut case. While in broad terms, both Midwest and Defendant Laird Plastics, Inc. ("Laird") operate in the plastics distribution industry, that is where their similarities end. Laird sells vastly different plastics products to a largely dissimilar customer base within the specific geographical region at issue in this case – a fact Midwest attempts to discredit by asserting overgeneralized, unsupported statements that would lead an industry outsider to believe both companies sell blue widgets to the same local hardware store. This Court should not be so easily persuaded.

The following facts are well-established by the actual record evidence: (1) Laird does not compete with Midwest in Portland, Oregon and has no intentions of expanding its operations to compete with Midwest; (2) Midwest's non-compete with Defendant Robert Dalpe ("Dalpe") is unenforceable; (3) Dalpe has not used or disclosed any of Midwest's purported confidential information; (4) Laird has not received any of Midwest's purported confidential information; (5) Dalpe's role at Laird has not impacted Midwest's business; and (6) Midwest will not suffer irreparable harm. Notwithstanding, Midwest seeks to harm Laird, its employees, and effectively eliminate Dalpe's ability to earn a living. The Court should deny Midwest's request for such an extraordinary remedy because it lacks legal support and is based on mere suspicion, not credible evidence.

## FACTUAL BACKGROUND

### I.    About Laird Plastics, Inc.

Laird is a North American plastics distributor with over 25,000 customers in commercial, industrial, and advertising markets. (Jenkins Decl. ¶ 2.) Laird operates 50 locations in the continental United States and Canada, including a facility in Portland, Oregon. (Jenkins Decl. ¶ 3.) As a result of its geographic breadth, each Laird location tailors its product offerings to the demands of the individual local market. (Jenkins Decl. ¶ 4.) Consequently, by way of example only, a Laird facility in Chicago, Illinois may offer different products to its individual market than a Laird facility in Baton Rouge, Louisiana. (Jenkins Decl. ¶ 5.)

A Profit Center Manager ("PCM") leads each Laird location and is responsible for overseeing all aspects of local operations including hiring and terminating personnel,

developing and implementing sales strategies, selecting suppliers, and identifying investment opportunities. (Jenkins Decl. ¶ 6.) The PCM's report to a Regional Manager, but are generally free to make independent business decisions in alignment with business objectives as guided by the opportunities in the local market. (Jenkins Decl. ¶ 7.)

## II.    Laird's Portland Location.

Laird's Portland location's geographical territory incorporates the entire state of Oregon and the metropolitan areas of Longview, Washington and Vancouver, Washington (hereinafter "Portland Market"). (Jenkins Decl. ¶ 8.) Dalpe is the current PCM for the Portland location. (Jenkins Decl. ¶ 9.) At present, seven other employees work at Laird's Portland location – five sales personnel and two warehouse personnel. (Dalpe Decl. ¶ 2.) The five sales personnel include three inside sales representatives and two outside sales representatives, Dylan Lindell ("Lindell") and Richard Locke ("Locke"). (Dalpe Decl. ¶ 3.) Outside sales representatives are responsible for, among other things, marketing and selling plastic products to customers in the Portland Market. (Dalpe Decl. ¶ 4.) Lindell focuses his marketing and sales efforts on the Portland metropolitan area. (Dalpe Decl. ¶ 5.) Locke focuses on the southern Oregon territory. (Dalpe Decl. ¶ 6.)

## III.    Laird's Product Sales in the Portland Market.

Laird's Portland location currently distributes plastic products to approximately 350 customers in the Portland Market. (Jenkins Decl. ¶ 10.) Within the Portland Market, Laird offers three categories of plastic products: (1) graphic materials/rigid sheet stock; (2) see-through materials such as acrylic and polycarbonate; and (3) mechanical/engineering materials, such as ultra-high molecular weight polyethylene, low-density polyethylene,

high-density polyethylene, nylons, and acetals. (Jenkins Decl. ¶ 11.) Lindell, an outside sales representative who has worked for Laird for over 27 years, markets and sells these products in the Portland metropolitan area. (Jenkins Decl. ¶ 12.)

A.   Graphic Materials/Rigid Sheet Stock.

Graphics materials are semi-rigid plastics primarily used for large, indoor signage. (Jenkins Decl. ¶ 13.) Laird sells graphics materials on a large volume basis to companies that create sizable indoor and outdoor signage for large-scale retailers such as Target. (Jenkins Decl. ¶ 14.) Upon information and belief, graphics materials were used to create the large Target bullseye frequently seen hanging from the ceiling, as well as the large exterior Target bullseye affixed to the outside of Target retail stores. (Jenkins Decl. ¶ 15.) Graphic materials' composition often limits extended use, as it will deteriorate over time. (Jenkins Decl. ¶ 16.)

B.   Acrylics and Polycarbonates.

Acrylics and polycarbonates are hard, unbreakable, and often optically transparent materials used to make various products that require a more durable and transparent plastic than graphics materials. (Jenkins Decl. ¶ 17.) Laird sells acrylics and polycarbonates on a large volume basis to manufacturers and fabricators who fabricate and sell end-user plastic products such as pastry display cases, jewelry counters for showing merchandise, or clear plastic boxes for customers to drop their business cards to win a free lunch. (Jenkins Decl. ¶ 18; O'Rourke Decl. ¶ 6.) Laird also sells acrylics and polycarbonates on a large volume basis to manufacturers and fabricators who fabricate and sell security barriers such as those

4

used in local convenience stores to separate the customer from the sales clerk. (Jenkins Decl. ¶ 19.)

C.   Mechanical/Engineering Materials.

Mechanical/engineering materials are plastics used industrially to move products around manufacturing plants, like conveyor equipment. (Jenkins Decl. ¶ 20.) Laird divides its mechanical/engineering materials sales into two categories: (1) Maintenance Repair Operations ("MRO"); and (2) Original Equipment Manufacturers ("OEM"). (Jenkins Decl. ¶ 21.) MRO sales are end-users who use the materials for internal operations. For example, Amazon Fulfillment Centers use mechanical/engineering materials to move product through its distribution center – an inexpensive alternative to metal materials. (Jenkins Decl. ¶ 22.) OEM sales are manufacturers and fabricators who use the materials to create a subsequent product that they then sell to an end-user. (Jenkins Decl. ¶ 23.) For example, medical device manufacturers use mechanical/engineering materials to create various medical devices like handles for surgical instruments and sterilization trays. (Jenkins Decl. ¶ 24.)

IV.   **Midwest's Product Sales in the Portland Market.**

By contrast, Midwest admits it is a full-service supplier of sign materials including paints and substrates; screen materials including inks, adhesives, and frames; digital media, equipment, and software, and other digital services including customer signage, digital support, and letter coil. (*See* May Aff. ¶ 3 (emphasis added).) Midwest's business in the Portland Market is focused on screen-printing materials. (Dalpe Decl. ¶ 7; O'Rourke Decl. ¶ 5.) This includes screen-printing machines, ink, print screens, and chemicals used to clean

screen-printing equipment. (Dalpe Decl. ¶ 8 ; O'Rourke Decl. ¶ 5.) Midwest also sells other print-focused products, including oversized printers, inks used in digital printing, and rolled vinyl products. (Dalpe Decl. ¶ 9; O'Rourke Decl. ¶ 5.) Rolled vinyl products are used by printers to create adhesive signs or advertisements that are applied to walls, windows, or vehicles. (Dalpe Decl. ¶ 10; O'Rourke Decl. ¶ 5.)

Midwest does not generally sell the type of rigid plastic sold by Laird. (Dalpe Decl. ¶ 11; O'Rourke Decl. ¶ 7.) Although Midwest may have a few sheets available for customers, it neither stocks nor sells those products in bulk. (Dalpe Decl. ¶ 12; O'Rourke Decl. ¶ 7.) Consequently, any sales of rigid plastics are generally one-off sales to existing customers who add it to an order or who need limited quantities. (Dalpe Decl. ¶ 13; O'Rourke Decl. ¶ 7.) If a Midwest customer requires rigid plastics in bulk, Midwest directs them to a different vendor, including Laird. (Dalpe Decl. ¶ 14; O'Rourke Decl. ¶ 7.) Midwest also does not sell other various rigid plastic products sold by Laird, including plastic tubing, plastic rods, and plastic sheeting. (Dalpe Decl. ¶ 15; O'Rourke Decl. ¶ 8.)

## V.    Laird and Midwest Do Not Provide the Same Products to the Same Customers.

As demonstrated, Laird and Midwest do not currently market or sell the same plastic products within the Portland Market. The following chart depicts that there may be minimal overlap, but even then, as admitted by its current Chief Operating Officer and former sales managers, Laird or Midwest do not consider those sales to be primary product offerings. (May Aff., ¶ 3; Dalpe Decl. ¶ 16.) Rather, they are one-off sales to pre-existing customers who may need limited product quickly and as part of a customary product sale. *Id.*

| No. | Product | Midwest | Laird |
|---|---|---|---|
| 1 | Textile & graphic screen printing equipment | Sold regularly | Never sold |
| 2 | Emulsions & other chemicals for screen printing | Sold regularly | Never sold |
| 3 | Digital printing equipment | Sold regularly | Never sold |
| 4 | Digital technician services | Sold regularly | Never sold |
| 5 | Inks for textile & graphic screen printing | Sold regularly | Never sold |
| 6 | Inks for digital printing | Sold regularly | Never sold |
| 7 | Local delivery services | Sold regularly | Never sold |
| 8 | Estore sales | Sold regularly | Never sold |
| 9 | Assorted plastic tube | Never sold | Sold regularly |
| 10 | Assorted plastic rod | Never sold | Sold regularly |
| 11 | Assorted mechanical plastics sheets | Never sold | Sold regularly |
| 12 | Rigid plastic wall systems | Never sold | Sold regularly |
| 13 | Ultra-high molecular weight polyethylene | Never sold | Sold regularly |
| 14 | Low-density polyethylene | Never sold | Sold regularly |
| 15 | High-density polyethylene | Never sold | Sold regularly |
| 16 | Nylons | Never sold | Sold regularly |
| 17 | Acetals | Never sold | Sold regularly |
| 18 | Large order, cut-to-size plastics | Never sold | Sold regularly |
| 19 | Roll stock for digital printing & lamination | Sold regularly | Not sold in quantity |
| 20 | Rigid sheet stock for signage | Not sold in quantity | Sold regularly |

*Id.*

Numbers 1 through 8 are Midwest's screen-printing products. Laird does not currently sell and does not currently intend to sell screen-printing materials. (Dalpe Decl. ¶ 17; Jenkins Decl. ¶ 25.) Laird does not have the manufacturer distribution relationships to distribute screen-printing products such as pressure-sensitive adhesives and sign vinyls, and is not interested in developing those relationships for the purpose of competing in the Portland Market. (Dalpe Decl. ¶ 18; Jenkins Decl. ¶ 26.) Similarly, Laird does not have a distribution agreement with 3M, effectively prohibiting Laird from actively pursuing the sale of sign vinyl. (Dalpe Decl. ¶ 19; Jenkins Decl. ¶ 27.) Finally, Laird has never sold ink

7

and does not have the internal resources or external connections to facilitate entry into the ink market. (Dalpe Decl. ¶ 20; Jenkins Decl. ¶ 28.) Simply stated, Laird does not compete with Midwest in these areas at all, has no plans to, and does not believe that Dalpe's experience in these areas are of any benefit to Laird's Portland location. (Dalpe Decl. ¶ 21; Jenkins Decl. ¶ 29.)

Numbers 9 through 18 are Laird's acrylics, polycarbonates and mechanical/engineering products, which Midwest admittedly does not sell. (May Aff. ¶ 3; Dalpe Decl. ¶ 22; Jenkins Decl. ¶ 30.)

Numbers 19 and 20 represent the narrow graphics materials segment in which each company sells different, unrelated products, but can source if a customer requests it. Laird sells rigid sheet stock and Midwest sells roll stock, which is generally flexible packaging material. (Jenkins Decl. ¶ 31.) In rare instances, Laird may sell roll stock to an existing customer if the customer requests it. (Jenkins Decl. ¶ 32.) Roll stock, however, accounts for a miniscule amount of Laird's business in the Portland Market. (Jenkins Decl. ¶ 33.) Laird does not push roll stock in the Portland Market and does not intend to expand its sales of roll stock in the Portland Market. (Jenkins Decl. ¶ 34.)

Midwest similarly occasionally sells rigid stock, but it is not a focus of Midwest's business in the Portland Market. (Jenkins Decl. ¶ 35.) In fact, Midwest deliberately chose not to specialize in rigid stock because it does not have warehouse space to stock it, the Portland Market is already saturated with rigid stock competition, and it lacks the equipment needed to cut the plastic to the customer's specifications. (Jenkins Decl. ¶ 36.) Midwest sources rigid stock from other plastics distributors in order to satisfy the

occasional customer request. (Jenkins Decl. ¶ 37.) In the past year, <u>Midwest specifically directed a customer to Laird due to their inability to cut the rigid stock to the customer's specifications</u>. (Jenkins Decl. ¶ 38.)

Midwest and Laird also have different customer bases. (Dalpe Decl. ¶ 23; Jenkins Decl. ¶ 39.) Of Laird's approximate 350 customers in the Portland Market, fewer than ten are also customers of Midwest. (Jenkins Decl. ¶ 40.) These customers buy different products from each company – rigid stock from Laird and roll stock from Midwest – as denoted in numbers 19 and 20 in the chart above. (Jenkins Decl. ¶ 41.)

In sum, Laird and Midwest do not compete to sell the same products to the same customers in the Portland Market, and therefore, cannot be considered competitors.

## VI.   Midwest Allows Former Sales Representative With Same Restrictive Covenants to Work for Laird's Competitor Without Consequence.

Tim O'Rourke ("O'Rourke") is a former Midwest outside sales representative. (O'Rourke Decl. ¶ 3.) O'Rourke held this position from May 2013 until August 2016 and was responsible for marketing and selling Midwest product to customers in the Puget Sound area, including Seattle, Washington. (O'Rourke Decl. ¶ 4.) In this position, and over the course of three years, O'Rourke gained significant familiarity with Midwest's product line, customer base, competitors, and other companies that sold products to companies operating in the print and display industry, including those sold in the Portland area. (O'Rourke Decl. ¶¶ 4, 5.) In August of 2016, O'Rourke resigned his employment with Midwest and began working for Multicraft Plastics in Portland, Oregon. (O'Rourke Decl. ¶ 10.) Multicraft Plastics is a competitor of Laird's, and it markets and sells rigid plastic

sheets, rods, tubes, and other rigid plastics within the Portland Market. *Id.* Multicraft Plastics' customers include businesses in the print and display industry. *Id.*

After accepting employment with Multicraft Plastics, Midwest contacted O'Rourke claiming that his work with Multicraft Plastics violated the terms of his non-compete agreement with Midwest. (O'Rourke Decl. ¶ 11.) The non-compete provisions in O'Rourke's agreement mirrored those in Dalpe's agreement:

- For a period of 12 months after the termination of his employment, O'Rourke would not own, work for or assist any entity that offers products or services that compete with products or services that Midwest offers.

- For a period of 12 months after the termination of his employment, O'Rourke would not provide products or services that compete with Midwest's products or services to any entity who was a customer of O'Rourke's during his employment;

- During his term of employment, and for a period of 12 months after the termination of his employment, O'Rourke would not directly or indirectly hire or attempt to hire any of Midwest's employees or independent contractors or attempt to induce them to leave their employment with Midwest.

(O'Rourke Decl. Ex. 12.) O'Rourke disagreed with Midwest. (O'Rourke Decl. ¶ 11.) He maintained that Multicraft Plastics, like Laird, sold rigid plastics, which Midwest did not offer, and therefore was not a competitor. *Id.* Despite this disagreement, O'Rourke voluntarily agreed not to call upon the approximately twenty customers he had called upon

10

while employed by Midwest, which satisfied Midwest because it made no further claim against O'Rourke for violation of his non-compete agreement. (O'Rourke Decl. ¶ 13.)

**VII.   Midwest Allows Former Midwest Sales Representative With Same Restrictive Covenants to Work for Laird's Competitor Without Consequence.**

Calsak[1] is a competitor of Laird and has nine locations in the United States, including Portland, Oregon and Seattle, Washington. (Jenkins Decl. ¶ 43.) Calsak sells the same three categories of plastics as Laird, competes in the same marketplaces as Laird, and has a similar organizational structure as Laird. (Jenkins Decl. ¶ 44.)

In 2015, Calsak extended an offer to Charles Pulliam, then a sales representative for Midwest, to be the PCM in its Seattle location. (Jenkins Decl. ¶ 45.) Calsak and Laird operate in what was Pulliam's geographical territory at Midwest, which consisted of California, Oregon, Washington, and select areas of Idaho, Montana, Alaska, and British Columbia. (Dalpe Decl. ¶ 24.) Pulliam's proposed geographical territory at Calsak consisted of Washington State. (Dalpe Decl. ¶ 25.) Pulliam accepted the position, and after his departure, Midwest promoted Dalpe to Pulliam's former role. (Dalpe Decl. ¶ 26.) Midwest removed California from Dalpe's territory, thus reducing it to Oregon, Washington, and select areas of Idaho, Montana, Alaska, and British Columbia. (Dalpe Decl. ¶ 27.)

Importantly, Pulliam and Dalpe had the same non-compete with Midwest. (Jenkins Decl. ¶ 46; Nodes Decl. ¶ 2, Ex. A.) Following Pulliam's notice to Midwest of his intent

---

[1] Port Plastics is the parent company of Calsak. (Jenkins Decl. ¶ 42.)

to work for Calsak, representatives from Calsak and Midwest discussed the implications of his non-compete agreement. (Jenkins Decl. ¶ 47.) Calsak maintained that Pulliam's non-competition restrictions were not applicable to his employment with Calsak because Calsak and Midwest were not direct competitors. Notwithstanding, and in an effort to avoid protracted litigation, Calsak committed to the following with respect to Pulliam's employment:

- Calsak directed Pulliam to not use or disclose any Midwest confidential information for the benefit of Calsak;

- Calsak directed Pulliam to not knowingly directly contact, or direct other Calsak employees to contact, any Midwest customers for the purpose of soliciting and/or selling any products competitive to the products provided by Midwest to such customers for a period of twelve months following his separation from Midwest; and

- Calsak directed Pulliam to not directly or indirectly hire any Midwest employees at Calsak.

(Jenkins Decl. ¶ 48, Ex. A.) In exchange, Midwest agreed it would not seek enforcement of the non-compete agreement against Pulliam or Calsak. *Id.* At present, Pulliam remains employed at Calsak and is not subject to any restrictions with respect to Midwest. (Jenkins Decl. ¶ 49.)

### VIII.  Laird Hires Dalpe.

In 2018, Laird's Regional Manager, Jason Jenkins, initiated a search for a new PCM for the Portland location. (Jenkins Decl. ¶ 50.) In December 2018, Pulliam suggested to

12

Jenkins that Dalpe may be a strong candidate for the position and arranged an informal lunch between Jenkins and Dalpe. (Jenkins Decl. ¶ 51.) In anticipation of his meeting with Jenkins, Dalpe reviewed Midwest's Portland Market customer lists to ensure there would be no potential issues with his possible employment with Laird. (Dalpe Decl. ¶ 28.) In his eight-year tenure at Midwest, Dalpe could not identify any customers or circumstances in which Midwest and Laird competed in the Portland Market. (Dalpe Decl. ¶ 29.)

During the initial lunch and subsequent meetings, Jenkins and Dalpe generally discussed Dalpe's experience with Midwest, but more importantly, his experience working for Tap Plastics prior to Midwest. (Jenkins Decl. ¶ 52.) Jenkins described Laird's desire to grow its Portland Market sales by adding equipment to fabricate and process plastics.[2] (Jenkins Decl. ¶ 53.) In other words, to manufacture and fabricate end-user products that could be sold directly in the market. Dalpe generally described his experience leading plastic fabrication operations at Tap Plastics, and Jenkins and Dalpe agreed that Dalpe's experience would be an asset to Laird and support Laird Portland's sales strategy. (Jenkins Decl. ¶ 54; Dalpe Decl. ¶ 30.) Dalpe's experience as Sales Manager with Midwest, including his conference attendance and training, his sales strategies for Midwest products and customers, and his relationships with Midwest customers did not appeal to Laird because Laird and Midwest did not market and sell the same products and Laird's sales strategy did not include expanding into Midwest's product lines. (Jenkins Decl. ¶ 55.)

---

[2] Items such as cosmetic displays, machine guards, starwheels, pullies, rollers, and sprockets.

Based on these discussions, and the understanding that Midwest did not compete directly with Laird, Jenkins offered the Portland location PCM position to Dalpe on February 25, 2019. (Jenkins Decl. ¶ 56.) Dalpe notified Midwest of his resignation the same day, with an effective separation date of March 8, 2019. (Dalpe Decl. ¶ 31.) Dalpe started at Laird on March 19, 2019. (Dalpe Decl. ¶ 32.)

## IX.    Laird and Dalpe provide assurances to Midwest.

As indicated above, and as confirmed by Midwest in its brief, Dalpe emailed certain Midwest information to his personal email address both prior to and after meeting with Laird representatives. (Dalpe Decl. ¶ 33.) Dalpe did so in order to ensure compliance with his non-compete obligations and without any intention of sharing the information with Laird or using the information at Laird for competitive advantage. (Dalpe Decl. ¶ 34.) Dalpe also emailed certain Midwest information so that he could properly calculate commissions he believed were due and owing from Midwest. . (Dalpe Decl. ¶ 35.) It is undisputed that the last emails Midwest information to his personal account on January 29, 2019 – almost <u>one month</u> prior to the receipt of a job offer from Laird. *Id.*

Prior to the filing of the Complaint in this matter, and since that time, Laird and Dalpe, through their respective counsel, have repeatedly represented that:

- Laird has not requested or knowingly received any of Midwest's confidential information;

- Laird has directed Dalpe that he is not to use any of the information for the benefit of Laird or disclose Midwest's confidential information to Laird at any time for any reason;

14

- Dalpe has not forwarded Midwest's information to any other electronic account, downloaded the information, and/or stored the information in any other electronic medium, and has not printed the information or retained paper copies of any of Midwest's information;

- Dalpe has deleted all of Midwest's information from all personal electronic devices and mediums, including his personal cellular phone, personal email account, and personal computer;

- Dalpe has not directed any Laird employees to compete with Midwest and/or market any products and/or services competitive to the products and/or services provided by Midwest to Midwest customers.

(Nodes Decl. ¶ 3-5; Dalpe Decl. ¶¶ 37-38) Further, prior to this filing, Dalpe retained Computer Forensics Resources to examine the content of his personal devices and provide written assurance that he did not disclose Midwest's confidential information at any time and deleted all Midwest content as soon as directed by Midwest's counsel. (Dalpe Decl. ¶ 36, Ex. A.)

## LEGAL ARGUMENT

### I.   MIDWEST'S NON-COMPETE AGREEMENT IS UNENFORCEABLE.

Restrictive covenants are to be strictly construed. *Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985). Minnesota courts have approached noncompetition agreements with "a concern for the average individual employee who as a result of his unequal bargaining power may be found in oppressive circumstances." *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899 (Minn. 1965). The Minnesota Supreme Court explained that an

15

employee is selling his labor and in certain circumstances "cannot well afford to raise any objection to any of the terms in the contract of employment offered him, so long as the wages are acceptable." *Id*.

Accordingly, under Minnesota law, non-compete  agreements are generally "looked upon with disfavor, cautiously considered, and carefully scrutinized." *Medtronic, Inc. v. Hedemark*, 2009 Minn. App. Unpub. LEXIS 233, 2009 WL 511760, at *3 (Minn. Ct. App. Mar. 3, 2009) (quoting *Bennett*, 134 N.W.2d at 898). When evaluating non-compete agreements, courts determine whether the agreements "serve a legitimate employer interest and are not broader than necessary to protect this interest." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998).

To determine whether a non-compete agreement is "not broader than necessary," courts consider: "(1) whether the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; (3) how long the restriction lasts; and (4) the geographic scope of the restriction." *Boston Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039 (D. Minn. 2010) (citing *Prow*, 770 F.2d at 120). "The test applied in examining restrictive covenants is whether the restriction imposed on the employee is greater than reasonably necessary to protect the employer's business, considering the nature of the employment, the temporal restriction imposed, and the geographic scope of the restriction." *United Prods. Corp. of Am. v. Cederstrom*, 2006 Minn. App. Unpub. LEXIS 594, 2006 WL 1529478, at *3 (Minn. Ct. App. June 6, 2006) (citing *Bennett*, 134 N.W.2d at 899).

16

The non-compete provisions forced upon Dalpe by Midwest are indisputably vague and overly broad in two major respects. As such, the entire agreement is unenforceable under Minnesota law. First, the non-compete provisions restrict Dalpe from working in any capacity where any products or services that compete with Midwest are offered. As written, even if a company sells a single product that Midwest sells, regardless of quantity and without any further specifications, Dalpe cannot work there. For example, if allowed to stand as drafted, Dalpe could not work at an office supply store selling any type of ink and/or printing equipment, which such stores typically sell because it would violate the terms of the agreement.

This Court recently analyzed similar language in a non-compete agreement in *Marvin Lumber & Cedar Co. v. Severson*, No. 15-cv-1869, 2015 U.S. Dist. LEXIS 131196 (D. Minn. July 7, 2015) (Brisbois, M.J.). In *Marvin*, the non-compete prohibited the defendant from working in any industry involving "products or services that are competitive with any products or services of the Employer." *Id.* at *19. The Court held the restriction was overly broad and not sufficiently tailored to legitimate business interests because it did not define "competitive" products or services, left the terms open-ended, and effectively prohibited the former employee "from engaging in *any* business remotely related to or associated with Plaintiff's industry." *Id.* (emphasis in original).

Midwest's non-compete restrictions are no different. First, the agreement does not define "competitive products," the terms are vague, and it is not sufficiently tailored to protect Midwest's legitimate business interests specifically within the Portland Market. Second, the agreement lacks a geographic limitation. The non-compete prevents Dalpe

from working anywhere in the world in an industry that spans the globe. Instead of prohibiting Dalpe from working in select, relevant portions of a geographic territory, Midwest excludes Dalpe from working anywhere where competing products are sold.

The *Marvin* case is instructive here as well. In *Marvin*, the Court held a non-compete agreement *with* a geographic restriction was broader than necessary to protect the plaintiff's legitimate business interests. *Id.* at *19-20. The agreement prohibited the defendant from working "'within the geographic area in which the Employer does business[,]' including Plaintiff's *home state* of Wisconsin and surrounding states." *Id.* at *19 (emphasis in original). The Court reasoned, "[i]nstead of prohibiting Defendant from working in select, *relevant portions* of its geographic territory (i.e., territories in which Plaintiff performed particularly significant, confidential work for Plaintiff), Plaintiff excludes Defendant from its *entire territory*." *Id.* at *19-20 (emphasis in original). The Court held the language, on its face, was insufficiently defined and broader than necessary to protect legitimate business interests. *Id.* at *20.

Here, the non-compete does not have *any* geographical restriction, much less one that limits it to the geographical area where Midwest does business, which the Court considered too broad in *Marvin*. Certainly, in this instance where Dalpe's work for Midwest was limited to Oregon, Washington, and select areas of Idaho, Montana, Alaska, and British Columbia, a non-compete that applies to the entire world is overly broad.

The Court should deny Midwest's motion in its entirety because the non-compete restrictions do not define "competitive products," and thus are inherently and unlawfully vague and are broader than necessary to protect Midwest's legitimate business interests.

18

*See id.* at \*20 (stating "the Court could find that Plaintiff is unlikely to prevail on the merits of its claims and deny the motion in its entirety" because the agreement "is insufficiently defined and likely broader than necessary to protect Plaintiff's legitimate business interests.").

## II. MIDWEST FAILS TO DEMONSTRATE THAT THIS IS AN "EXTRAORDINARY" CASE REQUIRING ISSUANCE OF A TRO.

A temporary restraining order is a "drastic and extraordinary remedy" that should be issued only in clear cases, where this is little doubt that injunctive relief is necessary to prevent great and irreparable injury pending trial. *Travel Tags, Inc. v. UV Color*, Inc., 690 F. Supp. 2d 785, 797 (D. Minn. 2010) (J. Tunheim) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)); *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 694 (D. Minn. 2012).[3]

To obtain injunctive relief, Midwest must first establish the likelihood of success on the merits of at least one of the claims asserted. *See Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (vacating preliminary injunction because "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.") (quoting *CDI Energy Servs.*, 567 F.3d at 402 (affirming denial of injunctive relief because the movant "failed to meet his burden" to prove "likelihood of success on the merits")). This is the "most important" factor when evaluating motion for injunctive relief

---

[3] Although some of the cases cited in this brief concern temporary injunctions, not TROs, the analysis is the same. *M.G.M. Liquor Warehouse Int'l, Inc. v. Forsland*, 371 N.W.2d 75, 77 (Minn. Ct. App. 1985) ("This analysis applies equally to temporary restraining orders.").

in a non-compete case. *See SoftChoice, Inc. v. Schmidt*, 763 N.W.2d 660, 661 (Minn. Ct. App. 2009).

If, and only if, Midwest is able to establish a likelihood of success on the merits of at least one of the claims asserted, the Court must then turn to the remaining factors set forth in *Dataphase,* including: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that the injunction will inflict on other parties; and (3) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Midwest at all times bears the burden of establishing that a TRO is warranted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). None of the *Dataphase* factors can be satisfied on the record now before the Court.

A.     <u>Midwest Fails to Satisfy Its Burden to Prove Likelihood of Success On the Merits of Its Claims.</u>

The "evidence" of purported wrongdoing submitted to this Court by Midwest is incomplete, unsupported, and wholly countered by the clear and competent declarations submitted by O'Rourke, Dalpe, and Jenkins – individuals who Midwest admits are most familiar with its and Laird's business operations in the Portland Market. Midwest is not likely to prevail on any of the seven causes of action listed in the Complaint: (1) breach of contract; (2) violation of state trade secret acts; (3) violation of defend trade secrets act; (4) breach of duty of loyalty; (5) tortious interference with contract; (6) unfair competition; and (7) aiding and abetting.

i.      *Dalpe did not breach any terms of the 2015 agreement with Midwest.*

20

Even assuming *arguendo* that Midwest's 2015 non-compete agreement with Dalpe is enforceable, which it is not, Midwest has not and cannot establish that Dalpe breached any of the covenants or restrictions listed in the agreement.[4] As set forth in the non-compete, Dalpe must protect Midwest's confidential information and not solicit or compete with Midwest for a period of twelve months following termination of his employment with Midwest.[5] (ECF No. 6 at 9-10.)

Regarding confidential information, the 2015 agreement states:

I will not, during or after the term of my employment, disclose your confidential information to any other person or entity, or use your confidential information for my own benefit or for the benefit of another . . . . I will deliver to you immediately all of your confidential information, in whatever format, and will not retain any copies.

(ECF No. 6 at 9.) Critically, Dalpe has not disclosed any of Midwest's confidential information to any other person or entity, including Laird or Laird employees, at any time during or after his employment with Midwest. (Dalpe Decl. ¶ 37.) Moreover, Dalpe has not used any of Midwest's confidential information for his own benefit or anyone else's benefit. (Dalpe Decl. ¶ 37.) Dalpe, upon recognition that Midwest perceived his retention of certain information to be a violation of his agreement, deleted all remaining electronic copies of Midwest's confidential information and voluntarily submitted his personal

---

[4] Midwest asserts a breach of claim against Dalpe only. Midwest has no restrictive covenant with Laird to enforce against Laird.

[5] To the extent Dalpe's 2011 and 2015 agreements with Midwest are different, the 2015 agreement controls pursuant to its own terms. It states, "This Agreement incorporates our entire understanding about confidentiality and my obligations not to compete." (ECF No. 6 at 10.)

electronic devices for forensic analysis to confirm that he deleted the information and did not disseminate it to Laird or any other person or entity.

Midwest disingenuously argues the agreement requires more of Dalpe. The agreement does not prohibit Dalpe from emailing the information to a personal email account. Further, the agreement does not prohibit Dalpe from accessing the information to verify whether a potential opportunity with Laird would violate his non-compete obligations or to calculate commissions owed to him by Midwest. The agreement also does not require Dalpe to return the information upon his resignation. Simply put, Dalpe adhered to the obligations outlined in the 2015 agreement regarding confidential information in that he did not disclose any confidential information to any other person or entity or use it for his benefit or the benefit of another.

Similarly, Dalpe abided by the non-compete obligations, which again state:

For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not own, work for or assist any entity that offers products or services that compete with products or services that you offer.

For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not provide products or services that compete with yours to any entity who was a customer of yours during my employment with you.

(ECF No. 6 at 9-10.) Dalpe did not breach the non-compete because Midwest and Laird are not competitors and Laird's Portland facility does not generally offer the same products or services as Midwest in the Portland Market. (*See infra* Factual Background V.)

Midwest skirts around this reality by overgeneralizing and stating in conclusory fashion, "Laird is a direct competitor offering the same or similar services to customers

across Midwest's sales territories, including within the Pacific Northwest. Laird consults on the application of and provides signage products and services that are the same or similar to Midwest." (ECF No. 4 at 9.) Midwest apparently draws this conclusion because of product offerings listed on Laird's website and Mr. May's "general work in the industry." (*See* May Aff. ¶ 10.) As described above, Laird has over 50 locations throughout North America, each with different product offerings based on the needs of their individual marketplace. For this reason, product offerings listed on Laird's website cannot be considered a reliable or dispositive source of information regarding the particular product offerings in Laird's Portland location. A side-by-side comparison of the actual products sold by each company demonstrates that Midwest's assertion is false. It further demonstrates that Midwest and Laird are not direct competitors. Thus, because Dalpe cannot provide competitive products to Midwest customers as a Laird employee, he did not violate any purported non-compete obligations.

> ii.  *Dalpe did not improperly acquire or disclose any confidential information.*

Midwest is not likely to succeed on its trade secret claims because the facts do not satisfy the elements of those causes of action. Minnesota defines misappropriation, in relevant part, as the "(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (ii) disclosure or use of a trade secret of another without express or implied consent . . . ." Minn. Stat. § 325C.01, subd. 3 (2018).[6] "Improper means" is limited to "theft, bribery,

---

[6] The Defend Trade Secrets Act as well as Oregon and Washington State's misappropriation statutes require the same elements, which are equally unsatisfied on these

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at subd. 2.

Dalpe did not acquire Midwest's information by improper means. Dalpe was granted access to the information as a function of his position with Midwest and was never prohibited by agreement or policy from emailing Midwest information to his personal email account. *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 810 (D. Minn. 2017) (Nelson, J.) (holding employee's "confidentiality agreement did not *per se* prohibit him from forwarding emails to his personal email account. And absent this express prohibition—or again evidence of use or disclosure—the Court is hard-pressed to conclude that [the employee's] behavior falls under the definition of "improper means.")

Moreover, as established *ad nauseam* by now, Dalpe never disclosed any of the information and deleted it following his termination, and a forensic analysis will show the same. *Id.* (holding plaintiff is unlikely to succeed on the merits of misappropriation claim because no evidence existed showing former employee forwarded emails to new employer or otherwise personally used the information in a manner that is likely to constitute misappropriation).

Likewise, Laird never had knowledge or possession of the information at any time, much less disclosed it to anyone or any entity. Once Midwest informed Laird that Dalpe had information it deemed confidential, Laird instructed Dalpe not to provide it to Laird or

---

facts. 18 U.S.C. § 1836(b)(2) (2018); RCW § 19.108.01, subds. (1), (2) (2018); ORS § 646.461 subds. (1), (2) (2018).

anyone at Laird in any form and to keep it off Laird's systems. Midwest's mere suspicions to the contrary are wholly refuted by Laird's and Dalpe's consistent representations to Midwest as well as the declarations submitted in support of this Memorandum.[7]

> ### iii. Dalpe is permitted to take action in preparation for seeking other employment opportunities.

An employee's duty of loyalty prohibits him or her from soliciting the employer's customers for oneself, or from otherwise competing with his or her employer, while still employed. *Rehab Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987). However, employees who wish to change jobs or start their own businesses are not to be unduly hindered from doing so. *Id.* Thus, an employee has the right while still employed, to prepare to enter into competition with his or her employer. *Id.*

Midwest does not address this cause of action in its brief and seemingly concedes it will not prevail on this claim. In its Complaint, however, Midwest bases the claim on the false allegation that Dalpe unlawfully and surreptitiously removed confidential information with the intention of diverting Midwest's business. (ECF No. 1 at 25.) Midwest does not and cannot offer any evidence in support of this baseless claim. Dalpe's act of emailing information to a personal account was not improper, illegal, or done with ill intent. Midwest does not have a likely chance of prevailing on this claim.

> ### iv. Laird did not tortiously interfere with Dalpe's employment agreement with Midwest.

---

[7] Defendants anticipate that, by the time of the hearing, they will have the results of a forensic analysis completed on Dalpe's personal devices, which will verify Defendants' statements.

In order to establish tortious interference with contract, Midwest must show: (1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach. *Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982). "A successful claim requires proof of <u>all five elements</u>." *Bebo v. Delander*, 632 N.W.2d 732, 738 (Minn. Ct. App. 2001) (emphasis added). As this claim is predicated on an alleged breach of a non-compete obligation, the Court must be mindful that Courts view this restrictive covenant with disfavor. *See, e.g., Freeman v. Duluth Clinics, Inc.*, 334 N.W.2d 626, 630 (Minn. 1983) (citing *Bennett*, 134 N.W. 2d at 898).

Midwest is not likely to succeed on this claim because the non-compete agreement is invalid. Even if it were valid, which it is not, Dalpe did not breach it because Laird and Midwest are not competitors and Laird does not sell products or services competitive to the products or services provided by Midwest in the Portland Market. Further, Midwest failed to submit any evidence that Laird or Dalpe intended to interfere with the non-compete. To the contrary, Defendants reviewed it and correctly determined it did not apply. For these reasons, Midwest is not likely to prevail on this claim.

   *v.   Minnesota does not recognize an unfair competition claim.*

Midwest asserts a claim that does not exist. "Unfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests." *Koering*, 404 N.W.2d at 306; *see also United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632 (Minn. 1982) (stating unfair competition can be

based on tortious interference with contract). Midwest appears to base this claim on the same underlying allegations for its tortious interference and trade secrets claims. (ECF No. 1 at 26-27.) For the same reasons those claims lack merit, this claim cannot succeed either. Notably, Midwest does not address this cause of action in its brief and thus concedes it will not prevail on this claim.

> vi. *Midwest cannot show that Laird aided and abetted Dalpe.*

To establish a claim for aiding and abetting tortious conduct of another: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lerhman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).

Midwest bases its claim on the alleged misappropriation of information and tortious interference with Midwest's business relations. Midwest is not likely to succeed on its claim because neither Dalpe nor Laird committed an underlying tort. Defendants did not misappropriate information and there is no evidence of any interference with Midwest's business relations. Midwest, too, concedes it cannot prevail on this claim because it did not address this cause of action in its brief either.

### B.   Midwest will not suffer irreparable harm.

A temporary restraining order must be denied if Midwest cannot demonstrate that it will suffer irreparable harm in the absence of injunctive relief. *Travel Tags, Inc.*, 690 F. Supp. 2d. at 798 ("failure to show irreparable harm is an independently sufficient ground

upon which to deny a preliminary injunction") (quoting *Lewis*, 346 F.3d at 844); *Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 318 (8th Cir. 2009) ("Regardless of the strength of its claim on the merits, a movant . . . should show a threat of irreparable harm"); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998) (holding that a failure to demonstrate the threat of irreparable harm is sufficient to deny injunctive relief).

To demonstrate irreparable harm sufficient to grant a preliminary injunction, Midwest must demonstrate that the "harm is certain and . . . of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. V. F.C.C,* 109 F.3d 418, 425 (8th Cir. 1996). Indeed, Midwest must demonstrate that it will suffer irreparable harm that cannot be compensable with money damages. *See GreatAmerica Leasing Corp. v. Dolan*, No. 10-cv-4631, 2011 U.S. Dist. LEXIS 9301, at *5-6 (D. Minn. Jan. 31, 2011) (Tunheim, J.) (citing *Travel Tags, Inc.*, 690 F. Supp. 2d. at 798). Midwest cannot meet this standard. *Travel Tags, Inc.*, 690 F. Supp. 2d. at 798; *Aune v. Ludeman*, No. 09-15, 2009 WL 1586739, at *4 (D. Minn. June 3, 2009) ("[i]njunctive relief is not appropriate when the harm is merely speculative or based on a mere assumption of possible results.").

     i.   *Midwest's assertion that it will suffer a loss of customer relationships due to Dalpe's employment at Laird is baseless.*

Midwest argues it "faces irreparable harm in the form of loss of customer relationships" if the temporary restraining order is not granted. (ECF No. 4 at 25.) Midwest cites a number of cases apposite to the present facts, which demonstrate the alleged harm is fictional. For example, unlike the employer in *Creative Commc'ns Consultants v.*

*Gaylord*, Midwest has not lost any customers due to Dalpe's departure. 403 N.W.2d 654, 657 (Minn. Ct. App. 1987) (finding of irreparable harm when four clients followed former employee to new ad agency within weeks of him leaving his old ad agency).

Additionally, unlike the employers in *Hutchinson Tech. Corp. v. Magnecomp Corp.*, Midwest and Laird do not agree that they are direct competitors or that they sell the same products in the Portland Market. No. 06-1703, 2006 U.S. Dist. LEXIS 48391, at *10 (D. Minn. July 17, 2006). *See also West Publ'g Corp. v. Stanley*, No. 03-5832, 2004 WL 73590, at *6 (D. Minn. Jan. 7, 2004) (employee started a company offering effective search engine optimization and management solutions for law firms, which was the same service his previous employer provided); *Retek, Inc. v. Cox*, No. 03-4345, 2003 U.S. Dist. LEXIS, at *2 (D. Minn. Aug. 29, 2003) (employee worked for known competitor who, like the new employer, provided software and computer consulting services to major retail firms).

Unlike these cases, Midwest and Laird sell different products and have minimal customer crossover within the Portland Market. Of the few customers that both companies mutually serve, each sells different products to those customers. Accordingly, Midwest's assertion that it may lose customer relationships and suffer irreparable harm is unfounded and misleading at best.

> ii. *Midwest's assertion that it will suffer a loss of control of information is meritless.*

Midwest further argues it faces irreparable harm in the form of loss of "control of confidential and proprietary information" should the Court deny its request for a temporary restraining order. (ECF No. 4 at 25.) This alleged harm is also fictitious. Dalpe no longer

29

possesses any of Midwest's confidential information and there is no evidence – and in fact, he has adamantly denied – that he ever distributed it. To the extent he mentally retained any of Midwest's information, it is useless to Laird because Laird sells rigid sheet stock, acrylics and polycarbonates, and mechanical/engineering materials, not sign materials like Midwest.

The record now before the Court demonstrates not only the factual and legal insufficiency of all claims alleged, but further establishes that Midwest will not suffer irreparable harm if the temporary restraining order is denied.

C. The harm to Defendants if the temporary restraining order is granted outweighs any potential harm to Midwest.

Even if the other factors were satisfied, the Court should still deny Midwest's motion for temporary restraining order because the balance of harms weighs against granting a temporary restraining order. A temporary restraining order would effectively halt operations at Laird's Portland location and leave the location without a central leader to establish and implement its fabrication sales strategy, recruit and retain employees, review and modify operations and inventory control programs, monitor actual growth and forecast, and confer with various customers and vendors regarding the three plastic products sold in the Portland market. (Jenkins Decl. ¶ 57.) Essentially, Laird would forego a year of consistent and managed operations, which would cause significant and lasting setbacks far beyond the limited duration of a temporary restraining order. *Id*.

A temporary restraining order would especially harm Laird's sales strategy. (Jenkins Decl. ¶ 58.) Laird has current plans, with Dalpe at the forefront, to add equipment to

fabricate and process plastics. *Id*. Dalpe's background in fabrication with his former employer, Tap Plastics, is integral to Laird's strategy, which does not compete with Midwest in any way. *Id*. Without Dalpe as PCM, Laird would be unable to execute its planned growth in the Portland Market. *Id*.

The absence of a PCM also means that the Portland location will lose investment from the company. (Jenkins Decl. ¶ 59.) The PCM ensures his or her business complies with internal standard practice instructions ("SPIs"). *Id*. The SPIs ensure that each location follows business practices demanded by Laird's shareholders, which is critical to maintaining Laird's decentralized empowered model. *Id*. Without a PCM, the Portland location cannot demonstrate it complies with SPIs and will thus lose needed investment. *Id*.

The absence of a PCM would also adversely affect the seven other employees at the Portland location and Dalpe himself. (Jenkins Decl. ¶ 60.) Without a PCM, the employees will lack direction, vision, and a consistent and reliable workplace. *Id*. Dalpe would be without employment, which would cause him and his family significant financial hardship. *Id*.

Midwest's contentions that Laird shares ownership with other large companies and can afford to pay Dalpe for a yearlong vacation or find him other employment are false and outrageous, especially considering that Dalpe's work for Laird does not violate the terms of the non-compete. (Jenkins Decl. ¶ 61.) Midwest's contentions demonstrate that it has a complete lack of understanding of Laird's business because such solutions are non-starters. *Id*.

Conversely, if the motion for temporary restraining order is denied, Midwest would not be impacted. Business would continue as usual for Midwest. Laird and Midwest would simply continue to sell their respective products to their respective customers. This tips the balance of harms in Defendants' favor.

D. <u>Public policy supports a denial of Midwest's motion.</u>

Public policy supports a denial of Midwest's motion based on these facts and applicable law. A temporary restraining order is wholly improper where the non-compete agreement is unenforceable and is nonetheless not being violated. "Public policy more vehemently favors *not* enforcing overbroad, unduly restrictive non-competes" than the "public's general interest in the enforcement of valid, voluntarily entered contracts." *Marvin*, 2015 U.S. Dist. LEXIS 131196, at *25 (emphasis in original). Further, in light of the fact that Minnesota law generally disfavors non-competes, and in light of the fact that the non-compete provision is overbroad and unduly restrictive, public policy favors a denial of Midwest's motion.

## <u>CONCLUSION</u>

Temporary restraining orders are extraordinary remedies, not to be granted except in rare circumstances in the clearest of cases. Midwest has failed to carry its burden that such a far-reaching remedy is warranted here. For all of the foregoing reasons, Defendants respectfully request that the Court deny Midwest's motion in its entirety.

Dated: April 24, 2019          **JACKSON LEWIS P.C.**

                                    *s/ Jennifer A. Nodes*
                                    Jennifer A. Nodes #352172
                                    Jennifer Zwilling #389153
                                    150 South Fifth Street, Suite 3500
                                    Minneapolis, MN 55402
                                    Telephone: (612) 341-8131
                                    Fax: (612) 341-0609
                                    jennifer.nodes@jacksonlewis.com
                                    jennifer.zwilling@jacksonlewis.com

                                    **ATTORNEYS FOR DEFENDANT LAIRD PLASTICS, INC.**

Dated: April 24, 2019          **ANTHONY OSTLUND BAER & LOUWAGIE P.A.**

                                    *s/ Cory D. Olson*
                                    Cory D. Olson (#386941)
                                    colson@anthonyostlund.com
                                    3600 Wells Fargo Center
                                    90 South Seventh Street
                                    Minneapolis, MN 55402
                                    Telephone: (612) 349-6969

                                    **ATTORNEYS FOR DEFENDANT ROBERT DALPE**

4843-5071-4261, v. 1

33