UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Midwest Sign & Screen Printing
Supply Co.,

     Plaintiff,

v.

Robert Dalpe and Laird Plastics, Inc.,

     Defendants.

File No. 19-cv-00967 (ECT/SER)

**OPINION AND ORDER**

---

Daniel Oberdorfer and Nicole L. Faulkner, Stinson Leonard Street LLP, Minneapolis, MN, for plaintiff Midwest Sign & Screen Printing Supply Co.

Cory D. Olson, Anthony Ostlund Baer & Louwagie P.A., Minneapolis, MN, for defendant Robert Dalpe.

Jennifer A. Nodes and Jennifer Zwilling, Jackson Lewis P.C., for defendant Laird Plastics, Inc.

---

Midwest Sign & Screen Printing Supply seeks a preliminary injunction forbidding its former employee, Robert Dalpe, from "working for or assisting" his new employer, Laird Plastics, "in any capacity that competes with Midwest" in violation of an employment agreement between Midwest and Dalpe. Midwest has introduced evidence showing that Dalpe likely violated his employment agreement by emailing himself Midwest's confidential information before his Midwest employment ended and that, if not modified, Dalpe's new position would enable him to assist Laird in competing with Midwest. Midwest has not, however, shown a likelihood of success on other essential elements of its claims, and Laird and Dalpe have introduced evidence showing that Dalpe

no longer possesses or intends to use or disclose Midwest's confidential information and that Dalpe's job duties with Laird have been limited to minimize the probability of violating Dalpe's employment agreement with Midwest. For these reasons, among others, Midwest has not shown a likelihood of success on the merits or irreparable harm to justify ordering the extraordinary remedy of a preliminary injunction.

I

A

Midwest and Laird's business activities overlap but are not identical. Midwest is "a full-service supplier of sign materials, including paints and substrates; screen materials, including inks, adhesives, and frames; digital media, equipment, and software; and other digital services." First May Aff. ¶ 3 [ECF No. 5]; Mem. in Supp. at 2 [ECF No. 4] ("Midwest prides itself [on] being more than simply a supplier. It offers its customers a full-service experience with expert hands-on consultation from its experienced sales representatives."). Midwest serves customers in twenty-nine states. Weinberg Aff. ¶ 18, Ex. D [ECF No. 6]. Laird is "the largest plastics distributor in the nation," with fifty locations in the continental United States and Canada. Reply Mem. at 2 [ECF No. 36]; First Jenkins Decl. ¶¶ 2–3 [ECF No. 32] (stating Laird has over 25,000 customers). Laird says that "[a]s a result of its geographic breadth, each Laird location tailors its product offerings to the demands of the individual local market." First Jenkins Decl. ¶¶ 4, 7. At its location in Portland, Oregon, where Dalpe is supposed to work, Laird offers three categories of plastic products: (1) graphic materials, like rigid sheet stock and semi-rigid plastics, which are primarily used for large, indoor signage; (2) acrylics and

2

polycarbonates, which are hard and often see-through materials used when customers require a more durable or transparent product; and (3) mechanical/engineering materials, which are plastics used industrially, such as conveyor equipment in a manufacturing plant. *Id.* ¶¶ 11, 13, 17, 20.

Midwest and Laird dispute the extent to which they compete. Midwest says there is considerable identity between its business and Laird's, calling the two "direct competitors." Mem. in Supp. at 9; *see* First May Aff. ¶ 9; Second May Aff. ¶ 4 [ECF No. 38]. Laird says that it and Midwest do not "sell blue widgets to the same local hardware store," and that it "sells vastly different plastics products to a largely dissimilar customer base." Mem. in Opp'n at 1 [ECF No. 31]; First Jenkins Decl. ¶ 40 ("Of Laird's approximate 350 customers in the Portland Market, less than ten are also customers of Midwest."). Midwest and Laird's submissions identify specific products they both sell, albeit with different volume and regularity. These include "roll stock" (for digital printing and lamination) and "rigid sheet stock" (for signage). *See* Dalpe Decl. ¶ 16 [ECF No. 33]; Second May Aff. Ex. C [ECF No. 38-1]; First Jenkins Decl. ¶¶ 31–41. The Parties' submissions also identify products sold by one but not the other. Midwest sells screen-printing supplies and digital-printing inks; Laird does not. *Id.* Laird sells industrial plastics, also known as "rod and tube"; Midwest does not. *Id.*

B

Dalpe began working for Midwest in June 2011. Dalpe Decl. ¶ 1; Froelke Aff. Ex. A [ECF No. 7]. His first job was Operations Manager, which involved managing Midwest's warehouse, inventory, and customer support at a California location. Dalpe

Decl. ¶ 1; Mem. in Supp. at 2.  In April 2015, Midwest promoted Dalpe to the position of Northwest Sales Manager.  Dalpe Decl. ¶ 1; Weinberg Aff. Ex. A.  In this new role, Dalpe officed in Portland but oversaw sales for Midwest's "Pacific Northwest" region, which included all of Oregon and Washington, and parts of Idaho, Alaska, Montana, and British Columbia.  Weinberg Aff. ¶ 7.  According to Midwest's "Job Description" document, Dalpe's duties as Sales Manager included leading a team of five sales representatives, meeting with key customers, approving customer quotes and proposals, and "monitor[ing] Midwest's competition, their products, sales and marketing activities."  Weinberg Aff. Ex. C at 1.  He also participated in weekly sales calls with the Vice President of Sales and other Sales Managers nationwide.  Weinberg Aff. ¶ 17.[1]

As part of his promotion to Northwest Sales Manager, Midwest required Dalpe to renew his acceptance of a contract entitled "Confidentiality, Nonsolicitation and Noncompetition Agreement."  Weinberg Aff. Ex. B (2015 Agreement, hereinafter "Agreement"); *see also* Froelke Aff. Ex. A (2011 Agreement).  Principally at issue in this motion are the Agreement's non-disclosure (¶ 2), non-retention (¶ 3), and non-compete (¶¶ 5 and 6) provisions:

> 2.      I will not, during or after the term of my employment, disclose [Midwest's] confidential information to any other person or entity, or use [Midwest's] confidential information for my own benefit or for the benefit of another, unless [Midwest] expressly direct[s] me to do so.

---

[1]      Dalpe does not seem to dispute Midwest's description of his Northwest Sales Manager position or that his day-to-day responsibilities in his new position with Laird resemble the responsibilities of his former position with Midwest.  To show that the two positions are distinct (and not competitive), Dalpe focuses instead on the differences between Midwest and Laird's products and customers.  *See* Dalpe Decl. ¶¶ 7–23.

3.     If either [Midwest] or I terminate my employment, I will deliver to [Midwest] immediately all of [Midwest's] confidential information, in whatever format, and will not retain any copies. . . .

5.     For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not own, work for or assist any entity that offers products or services that compete with products or services that [Midwest] offer[s].

6.     For a period of 12 months after the termination of my employment (whether voluntary or involuntary), I will not provide products or services that compete with [Midwest's] to any entity who was a customer of [Midwest's] during my employment with [Midwest].

Agreement ¶¶ 2–3, 5–6.  The Agreement also contains choice-of-law and choice-of-forum clauses providing that Minnesota law shall govern "any disputes arising out of or in any [sic] related to this Agreement" and that Dalpe consents to jurisdiction in Minnesota courts. *Id.* ¶ 11.[2]

C

Around December 2018, Dalpe began meeting with individuals from Laird to discuss the possibility of leaving Midwest for Laird.  *See* First Jenkins Decl. ¶¶ 51–55.  On February 25, 2019, Laird offered Dalpe a position as the Profit Center Manager to lead

---

[2]     The Agreement also prohibits Dalpe from, "during the term of [his] employment or for a period of 12 months following the termination of [his] employment, directly or indirectly hir[ing] any of [Midwest's] employees or independent contractors, or otherwise attempt[ing] to induce them to leave their employment with [Midwest]." Agreement ¶ 7. Midwest does not allege that Dalpe has violated this term, and no evidence has been introduced to justify determining that there is a likelihood Dalpe may violate this term. *See* Mem. in Supp. at 19; Reply Mem. at 13 (discussing breach of non-compete, non-disclosure, and non-retention provisions).

Laird's Portland location. *Id.* ¶ 56. That same day, Dalpe informed Midwest that he intended to terminate his employment to work with Laird. Weinberg Aff. ¶¶ 19–20. Dalpe's last day at Midwest was March 8, 2019, and his first day at Laird was March 19, 2019. Dalpe Decl. ¶¶ 31–32.

Both before and after meeting with Laird representatives, Dalpe sent several emails from his Midwest work account to his personal account attaching Midwest documents. Dalpe Decl. ¶ 33; First May Aff. ¶¶ 12–13. The information included Midwest's annual profit and loss statements and daily margin reports dating back to 2015, account lists and contact information for over 2,700 Midwest customers, and copies of an offer letter and employment agreement for a recently-hired Midwest sales representative. *See* First May Aff. ¶ 13. Dalpe does not dispute that this information is confidential but testifies that he did this "in order to ensure compliance with [his] non-compete obligations and without any intention of sharing the information with Laird or using the information at Laird for competitive advantage," and so he could calculate his commission amount. Dalpe Decl. ¶¶ 34–35. Midwest says the "vast majority" of information Dalpe sent himself is not timely or pertinent to "the method by which [his] bonus or other compensation is calculated." First May Aff. ¶ 14.

Laird has not provided a job description for Dalpe's new position except to say that Profit Center Managers in general "lead[] each Laird location" and are "responsible for overseeing all aspects of local operations including hiring and terminating personnel, developing and implementing sales strategies, selecting suppliers, and identifying investment opportunities." First Jenkins Decl. ¶ 6. Dalpe will supervise five Laird sales

representatives and report to a Regional Manager. Dalpe Decl. ¶¶ 2–3; First Jenkins Decl. ¶ 7. Laird attempts to distinguish Dalpe's role from what he did at Midwest by saying he will help "grow its Portland Market sales by adding equipment to fabricate and process plastics," meaning items like "cosmetic displays, machine guards, starwheels, pullies, rollers, and sprockets"—something Midwest doesn't do. First Jenkins Decl. ¶ 53; Mem. in Opp'n at 13 n.2.

D

Three days after Dalpe notified Midwest that he would be resigning and taking a new position with Laird, counsel for Midwest wrote to Laird and Dalpe regarding his obligations under the Agreement. Oberdorfer Aff. ¶¶ 2–3, Exs. A, B [ECF No. 8]. According to Midwest, "[d]espite numerous written requests from Midwest's counsel, neither Laird nor Dalpe" provided adequate assurances "that Dalpe has ceased accessing and has destroyed Midwest confidential information," and Dalpe refused to "turn over [his] personal devices for Midwest's review . . . or preservation." Mem. in Supp. at 13; *see* Oberdorfer Aff. ¶¶ 4–6, Ex. C. In response to these communications, Laird agreed to restrict Dalpe from directly soliciting Midwest customers but did not agree to Midwest's request that Dalpe not supervise Laird sales representatives who solicit Midwest customers. Oberdorfer Aff. ¶ 6.

Midwest commenced this action against Dalpe and Laird on April 8, 2019. *See* Compl. at 29 [ECF No. 1]. Midwest asserts claims for breach of contract, violation of state and federal trade-secret acts, breach of the duty of loyalty, tortious interference with contract, unfair competition, and aiding and abetting. *Id.* ¶¶ 70–133. Midwest seeks

injunctive relief and monetary damages. *See, e.g.*, *id.* ¶ 80; *id.* at 28–29. There is diversity

jurisdiction over the case under 28 U.S.C. § 1332(a)(1). *See* Compl. ¶¶ 12–15 (alleging

that Midwest is a Minnesota corporation with a principal place of business in Minnesota,

Dalpe is an Oregon citizen, Laird is a Delaware corporation with its principal place of

business in Texas, and that there is over $75,000 in controversy).

On the same day it filed suit, Midwest moved for a temporary restraining order.[3]

ECF No. 3. Midwest's proposed order describes the relief it seeks. ECF No. 9. If entered,

the proposed order would enjoin Dalpe "from violating the terms of [the Agreement]." *Id.*

---

[3]     Midwest's motion for a temporary restraining order does not comply with Fed. R. Civ. P. 65(b), and therefore has been adjudicated—and will be decided—as a motion for a preliminary injunction. Relevant here, Rule 65(b) provides:

> **(b) Temporary Restraining Order.**
>
> **(1)** *Issuing Without Notice*. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
>> **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>>
>> **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

With respect to the requirements in subparagraph (b)(1)(A), Midwest did not file a verified complaint, and its affidavits do not address the need for an *ex parte* hearing. With respect to subparagraph (b)(1)(B), Midwest's attorney filed no certification. *See also Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 837–38 (D. Minn. 2011) (stating that because the defendants received notice and the motion for a temporary restraining order was fully briefed, "the Court will treat [the motion] as one for a preliminary injunction").

8

at 1. It also would enjoin Dalpe and Laird "from maintaining, using or disclosing any confidential or trade secret information belonging to Midwest." *Id.* at 1–2. A hearing on Midwest's motion occurred on May 2, 2019. ECF No. 41.

According to Laird, since Midwest filed its motion, Laird and Dalpe have "repeatedly represented" that Laird has not requested or received Midwest's confidential information, Laird has directed Dalpe not to use or disclose the confidential information, Dalpe has not forwarded or stored Midwest's confidential information, and Dalpe has deleted the information from all devices and mediums. Mem. in Opp'n at 14–15; Nodes Decl. ¶¶ 3–5 [ECF No. 35]; Dalpe Decl. ¶¶ 36–38. Dalpe also retained a computer-forensics firm "to examine the content of [his] personal devices and provide written assurance that [he] did not disclose Midwest's confidential information at any time and deleted all Midwest content." Dalpe Decl. ¶ 36.

At the hearing, Defendants provided new information about self-imposed restrictions to Dalpe's job at Laird. Following the hearing, and in response to an invitation from the Court, Laird filed a supplemental declaration outlining the limitations Laird represents it has imposed on Dalpe's employment:

> Dalpe is not to personally contact or attempt to contact any known Midwest customers, or direct another Laird employee to contact any known Midwest customers, during the Restrictive Period, for the purpose of soliciting and/or selling Shared Products [defined as roll stock and rigid sheet stock]. . . .
>
> [W]hile Laird may continue to sell rigid sheet stock to Shared Customers as it had prior to [Dalpe's] hire, during the Restrictive Period, [Dalpe] is not to be personally involved in

> these sales. . . . [or] any strategy discussions regarding Shared Products to Shared Customers. . . .
>
> [T]o the extent a Midwest customer contacts [Dalpe] during the Restrictive Period to purchase a Shared Product, he is to immediately direct them to [his supervisor] or to one of Laird's sales representatives.

Second Jenkins Decl. ¶¶ 8(a)–(c) [ECF No. 43]. Additionally, all employees at Laird's Portland location were instructed "not to discuss known Midwest customers or Shared Customers with Dalpe at any time during [the] Restrictive Period." *Id.* ¶¶ 9–10. Laird emphasizes these limitations on Dalpe's employment were imposed to "avoid further litigation" and are not an admission of liability. *See id.* ¶ 8 & n.1.[4]

## II

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Our Eighth Circuit's oft-cited *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v.*

---

[4] Midwest filed a letter in response to Laird's supplemental declaration. ECF No. 44. In it, Midwest asks the Court to strike certain paragraphs from the Second Jenkins Declaration that provide "new representations of fact" and "recertification of prior testimony" because, Midwest contends, these assertions go beyond the scope of what the Court permitted. *Id.* at 1. The Court invited Defendants to submit the supplemental declaration to clarify the precise extent of Laird's self-imposed restrictions on Dalpe's new job duties. ECF No. 41. The declaration will be considered only insofar as it describes facts concerning that issue.

*Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citation omitted).  The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (footnote omitted).  "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations and internal quotation marks omitted).  Although this factor uses the term "probability," the movant need not show a greater than fifty percent likelihood of success. *CPI Card Grp.*, 294 F. Supp. 3d at 807.  And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts." *Id.* (citation omitted). "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (citation omitted).  Midwest focuses on the merits of three of its claims—(1) breach of contract, (2) misappropriation of trade secrets, and (3) tortious interference with contract—and they will be addressed in turn.

1

Under Minnesota law, a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d

981, 989 (D. Minn. 2006) (citation omitted). Midwest contends that it is likely to succeed on its breach-of-contract claim based on Dalpe's breach of the Agreement's non-compete, non-retention, and non-disclosure provisions. *See* Mem. in Supp. at 19; Reply Mem. at 13. Dalpe and Laird dispute the validity of the non-compete covenants and the existence of a breach of the Agreement. Mem. in Opp'n at 15–23.

a

To be enforceable under Minnesota law, a restrictive covenant must be no broader than necessary to protect the employer's legitimate interests. *Kallok v. Medtronic*, 573 N.W.2d 356, 361 (Minn. 1998).[5] Four factors bear on this reasonableness inquiry: the nature and character of the employment relationship; the length of the restriction; the restriction's geographic scope; and whether the restraint is necessary to protect the employer's goodwill, trade secrets, or confidential information. *Roth v. Gamble-Skogmo, Inc.*, 532 F. Supp. 1029, 1031 (D. Minn. 1982); *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899 (Minn. 1965).

Under the blue-pencil doctrine, courts may "take an overly broad restriction and enforce it only to the extent that it is reasonable." *Klick v. Crosstown State Bank of Ham*

---

[5]     "Where a noncompetition agreement is not ancillary to an employment contract," as with Dalpe's Agreement, "it must be supported by independent consideration to be enforceable." *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993). In other words, the existing employee must receive something new, such as a "promotion, special training, or other benefit in return for signing" in order for the non-compete to be enforceable. *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 998 (D. Minn. 2013). Here, the Parties do not dispute that the Agreement was supported by adequate consideration. Dalpe received a promotion in consideration for signing the non-compete, which included a raise, eligibility for a bonus compensation program, a company car, and relocation expenses. Weinberg Aff. Ex. A.

*Lake, Inc.*, 372 N.W.2d 85, 88 (Minn. Ct. App. 1985). This function is within the district court's discretion, but "no cases say that a court must" blue-pencil an unreasonable restrictive covenant. *Id.*; *Marvin Lumber & Cedar Co. v. Severson*, No. 15-cv-1869 (MJD/LIB), 2015 WL 5719502, at *8 (D. Minn. Sept. 28, 2015) ("[N]othing in Minnesota state law *requires* the Court to blue-pencil Plaintiff's non-compete provisions."); *see also Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 n.1 (Minn. 1980) (recognizing that the blue-pencil doctrine "*allows* a court to modify an unreasonable noncompetition agreement" (emphasis added)).

A review of the case law suggests that blue-penciling is most appropriate for editing a restrictive covenant's temporal and geographic limitations (or lack thereof), not "rewrit[ing] the agreement wholesale." *Gavaras v. Greenspring Media, LLC*, 994 F. Supp. 2d 1006, 1012 (D. Minn. 2014) ("Blue-penciling this restrictive covenant does not make sense. Modifying this agreement would require more than modifying the duration and territorial scope. The Court would need to rewrite the agreement wholesale, and rewriting would require the Court to divine the parties' intent at the time of contracting . . . ."); *see also Advance Contract Equip. & Design LC v. Lamere*, No. A15-0084, 2015 WL 5089167, at *5 (Minn. Ct. App. Aug. 31, 2015) ("[I]t is unlikely that a determination that the agreement is unreasonable in temporal or geographic scope would void the entire agreement."); *see, e.g.*, *Dean Van Horn Consulting Assocs., Inc. v. Wold*, 395 N.W.2d 405, 409 (Minn. Ct. App. 1986) (referencing how "the trial court modified the restrictive covenant from a three-year period to a one-year period"); *Satellite Indus., Inc. v. Keeling*, 396 N.W.2d 635, 640 (Minn. Ct. App. 1986) ("Unreasonably broad non-competition

agreements can be limited to include only the area where the employee performed duties, the employer's business area, the employer's customers, or a reasonable geographical area." (internal citations omitted)). Still other cases refer to blue-penciling as a method of severing unenforceable provisions, rather than redlining them. *See Bess v. Bothman*, 257 N.W.2d 791, 794 (Minn. 1977) ("The rationale of the blue pencil doctrine is that a court is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties."); *Alside, Inc. v. Larson*, 220 N.W.2d 274, 280 (Minn. 1974) (stating the blue-pencil doctrine "permits a court to strike . . . those provisions which may be unenforceable").

Here, the Agreement's time limits are reasonable. The non-compete covenants (¶¶ 5 and 6) have a temporal limit of twelve months; the non-disclosure provision (¶ 2) has no time limit. The Parties do not dispute that one year is a reasonable period for the non-competes. One-year non-competes are routinely upheld, particularly when the temporal restriction is accompanied by a geographic restriction. *Guidant Sales Corp. v. Baer*, No. 09-cv-0358 (PJS/FLN), 2009 WL 490052, at *4 (D. Minn. Feb. 26, 2009) (referencing how courts "have consistently found one-year restrictions that are limited to a former employee's sales area to be reasonable" (citation omitted)). Defendants do not dispute that the absence of a time limit on the non-disclosure provision is reasonable.

The Agreement's non-compete covenants (¶¶ 5 and 6), however, have no geographic bounds, and the absence of a territorial limitation renders these terms overbroad and unenforceable. True, "[t]here is no per se rule under Minnesota law that a restriction is unenforceable if it lacks a geographic limitation." *Nilfisk, Inc. v. Liss*, 17-cv-1902

(WMW/FLN), 2017 WL 7370059, at *5 (D. Minn. June 15, 2017) (citation omitted); *see also Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn. Ct. App. 1993). But given that Midwest does business in twenty-nine states and Dalpe oversaw only the Pacific Northwest region, it is difficult to understand the absence of a territorial limitation. *See Marvin Lumber*, 2015 WL 5719502, at *8 ("Instead of prohibiting Defendant from working in select, *relevant portions* of its geographic territory . . . , Plaintiff excludes Defendant from its *entire territory*."); *Lexis-Nexis*, 41 F. Supp. 2d at 957 ("[G]iven the inherently territorial nature of Beer's customer contacts, the almost worldwide application of the noncompete agreement makes its geographic scope unreasonably broad."); *see also Medtronic, Inc. v. Hughes*, 2011 WL 134973, at *5–6 (Minn. Ct. App. Jan. 18, 2011) (affirming district court's finding that "Medtronic's worldwide noncompete covenant was reasonable" as applied to a particular employee because "Medtronic operates on a global scale" and the noncompete contained a "product-specific limitation" for certain cardiology products).

Midwest's position at the hearing on this motion supports the conclusion that a geographically boundless non-compete covenant goes well beyond what is necessary to protect Midwest's business interests here. At the hearing, Midwest suggested—Agreement aside—it would not object to Dalpe working in a territory outside the Pacific Northwest. This might very well include other territories where Midwest and Laird compete. It seems reasonable to infer from Midwest's position that its business interests adequately would be served by a geographic restriction that shares boundaries with the Pacific Northwest territory in which Dalpe worked. Consistent with its position at the hearing, Midwest has

requested that the Agreement, if overbroad, be blue-penciled to include a geographic limitation coterminous with Midwest's Pacific Northwest territory. Though it would narrow the Agreement's scope significantly, granting this request seems reasonable. As noted earlier, courts applying Minnesota law have blue-penciled restrictive covenants to include only "the area where the employee performed duties, the employer's business area, the employer's customers, or a reasonable geographical area." *Satellite Indus.*, 396 N.W.2d at 640 (internal citations omitted). And doing so here would be consistent with Midwest's legitimate business interests. That territory is where Dalpe worked, his customer relationships are most likely to exist, his knowledge of Midwest's business is likely most extensive, and, it follows, where he could cause Midwest the greatest harm. But granting this request does not save the Agreement's non-compete covenants.

Geography aside, the non-compete covenants—on first review in the context of a request for a preliminary injunction—appear likely to be unreasonably overbroad in their description of prohibited work. The Agreement provides that "[f]or a period of 12 months after the termination of [his] employment (whether voluntary or involuntary), [Dalpe] will not own, work for or assist any entity that offers products or services that compete with products or services that [Midwest] offer[s]." Agreement ¶ 5. Nor will he "provide products or services that compete with [Midwest's] to any entity who was a customer of [Midwest's] during [his] employment with [Midwest]." *Id.* ¶ 6. The Agreement does not define what it means by "products or services that *compete* with products or services that [Midwest] offers." *Id.* ¶ 5 (emphasis added). This term reasonably may be understood to

prohibit Dalpe from working for a remarkably broad array of potential employers.  In its complaint, Midwest describes the services it offers:

> Midwest's primary business is to help companies in the screen printing, digital printing, and sign industries grow their business by offering general consultation services, digital printer repair and maintenance services, selection consultation and delivery of products including, but not limited to, acrylics, Alucobond, Dibond, Gatorfoam, Sintra, foamboard, styrene, banner, and most rigid and flexible industry substrates.

Compl. ¶ 12.  Defendants reasonably observe that many businesses offer one or more of these products or services and hypothesize, as an example, that the Agreement's non-compete terms would prohibit Dalpe from working in an office-supply store or any similar retail business that sells any of the listed products.  Mem. in Opp'n at 17.  Though it characterizes Laird's position on this issue as "ludicrous," Midwest has neither argued nor explained why it does not compete with office-supply or similar businesses.  There is no evidence, for example, showing that Midwest customers do not also obtain products and services Midwest sells from these types of businesses.  In addition to prohibiting Dalpe from working for a seemingly vast array of employers, the Agreement seems unreasonably overbroad because it would prohibit Dalpe from working in roles with these employers that are entirely dissimilar from his Northwest Sales Manager position.  Hypothetically, for example, he would be prohibited from managing inventory, directing human resources, or even working as a delivery driver because each of these roles would entail "work[ing] for . . . an[] entity that offers products or services that compete with [Midwest's]." Agreement ¶ 5.

The only source of a limitation that might resolve these problems (or perhaps provide a starting point for blue-penciling the Agreement to resolve them) is the term "compete." There may be a reasonable definition of this term that might have the effect of narrowing the reach of the Agreement's non-compete covenants, but Midwest does not identify it. Its submissions do not address its intended or preferred interpretation of this word. When asked at the hearing what "products or services that compete with products or services that [Midwest] offers" means, Midwest responded initially by implying that the phrase's meaning is self-evident: "That means products or services that compete with products or services that Midwest offers." Midwest also suggested that the "common, everyday reading" of "compete" should be limited by how it is understood within the industry, but there is no evidence in the record suggesting an industry understanding of the term, much less one that reasonably would narrow the breadth of the restriction. Perhaps businesses like Midwest share an understanding that they do not compete with businesses—for example, retail office-supply stores—though they may sell some of the same products. But the record contains no evidence of that. Midwest does not contend that the non-compete provisions should (or may) be blue-penciled to address this issue, and the breadth of these provisions, the inability to clearly define the scope of "products or services that compete with . . . [Midwest's]," and the absence of evidence showing the Parties' intent with respect to this issue seem to make that task impracticable and unwise. *Cf. Southland Metals, Inc. v. Am. Castings, LLC*, 800 F.3d 452, 459 (8th Cir. 2015) (addressing a noncompete in a business-to-business agreement that did not define

"compete," which made the contract ambiguous and required looking to "extrinsic evidence to determine the intent and meaning of the parties").

Other cases with similar non-compete language bolster the conclusion that the Agreement's non-compete terms likely are overbroad. In *Marvin Lumber*, the non-compete prohibited the employee from working for any entity "engaged in the . . . marketing, sale, support or promotion of any products or services that are competitive with any products or services of [employer]," 2015 WL 5719502, at *3 (first alteration in original)—a close parallel to Midwest's prohibition on Dalpe "work[ing] for or assist[ing] any entity that offers products or services that compete with products or services that [Midwest] offers," Agreement ¶ 5. The court concluded that the agreement was overbroad and not sufficiently tailored because it "effectively prohibit[ed] Defendant from engaging in *any* business remotely related to or associated with Plaintiff's industry." *Marvin Lumber*, 2015 WL 5719502, at *8. The same result was reached in *Gavaras*. There, the employee "agree[d] to not engage in any activities in competition with [employer]." *Gavaras*, 994 F. Supp. 2d at 100. The court found the non-compete invalid because "[t]here is no definition of competing activities" or identification or description of the employer's "competition." *Id.* at 1011. The court observed that the failure to "circumscribe competing activities . . . leaves the employee guessing about what companies compete with [employer] in ways that come in conflict with the Noncompete Agreement." *Id.*

In some cases, by contrast, employment agreements have defined what it meant to "compete." *See, e.g.*, *Prime Therapeutics v. Beatty*, 354 F. Supp. 3d 957, 963 (D. Minn.

2018) (defining "Competitive Product" based on products "marketed, sold or under development . . . during the twelve months preceding Employee's termination," as well as being "of the same general type" and "used for the same or similar purposes," among other things); *Life Time, Inc. v. Glory Gains Gym LLC*, No. 18-cv-1127 (DWF/DTS), 2018 WL 2539095, at *1, *3 (D. Minn. June 4, 2018) (finding non-compete that defined "Competing Business" as an organization "engaged in the business of providing fitness club-related services" was reasonable); *Bos. Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1035–36 (D. Minn. 2010) (defining "Competitive Product" and providing examples: "[s]uch products include, but are not limited to, cardiac pacemakers, implantable defibrillators . . . resynchronization devices, and leads"). In other cases, non-competes have contained explicit exceptions or "carve-outs" that clearly identify non-competing roles. *See, e.g.*, *Prime Therapeutics*, 354 F. Supp. 3d at 963 (leaving employee "free to work for or provide services to a competitor" provided the employee "has not assumed a position with a competitor that would lead to the inevitable disclosure of Confidential Information"); *Vascular Sols., Inc. v. Pedregon*, No. 09-cv-2089 (DWF/JJG), 2009 WL 2743022, at *2 (D. Minn. Aug. 26, 2009) (providing that "nothing in this [agreement] shall prohibit the employee's employment by . . . any entity . . . which engages in a business with a product or service competitive with any product or service of [employer] so long as" the new employer "takes reasonable measures to insure that the [e]mployee is not involved with or consulted in any aspect of the design, development, production, marketing, or servicing of such competitive product or service"); *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 453 (Minn. Ct. App. 2001) ("It is expressly understood that the employee is

free to work for a competitor [of Medtronic] provided that such employment does not include any responsibilities for, or in connection with, a Competitive Product as defined in this Agreement."). The Agreement does not include these features, making these cases distinguishable. Because the non-compete covenants are likely overbroad and unenforceable, Midwest is not likely to prevail on the merits of its claim that Dalpe breached these terms.[6]

b

Apart from the non-compete covenants, Midwest alleges that Dalpe breached the Agreement's non-retention and non-disclosure clauses. The non-retention clause unambiguously provides that upon his termination, Dalpe would "deliver to [Midwest] immediately all of [Midwest's] confidential information, in whatever format, and w[ould] not retain any copies." Agreement ¶ 3. Dalpe does not dispute that he retained copies of Midwest's information, Dalpe Decl. ¶ 33, nor does he dispute that this information qualifies as "confidential information" as defined in the Agreement, *see* Mem. in Opp'n at 21–22. Dalpe argues that the Agreement "does not require Dalpe to return the information upon his resignation," but this is plainly incorrect. Mem. in Opp'n at 22.

---

[6]    Midwest's proposed order contains limitations that differ from the non-compete terms. It would enjoin Dalpe "from working for or assisting Laird in any capacity that competes with Midwest in violation of the 2015 Agreement." Proposed Order ¶ 1.b. This is not what the Agreement says. The Agreement does not merely forbid employment in competitive capacities. It forbids working in *any* capacity for an employer "that offers products or services that compete with . . . [Midwest's]." Agreement ¶ 5 (emphasis added). In this respect, the proposed order is narrower than the Agreement.

Midwest's likelihood of success on this claim nonetheless does not tilt significantly in favor of granting the requested injunction. The record evidence shows that Dalpe complied eventually with the non-retention clause by deleting the information. *See* Dalpe Decl. ¶ 36. And the absence of evidence showing that he used this information to compete with Midwest likely minimizes, and perhaps undermines altogether, Midwest's ability to establish damages. *See* Reply Mem. at 13. Regardless, this breach would not provide justification for the proposed order Midwest seeks. It would provide justification for an order compelling Dalpe to do what the breached term requires—return (or perhaps destroy) all confidential information. And the evidence shows this is something Dalpe already has done. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, No. 13-cv-2262 (JRT/LIB), 2015 WL 4548687, at *2 (D. Minn. July 28, 2015) ("[A]n injunction should be limited in scope to the extent necessary to protect the interests of the parties."); *Novus Franch., Inc. v. Dean*, No. 10-cv-2834 (JRT/SER), 2011 WL 1261626, at *5 (D. Minn. Mar. 30, 2011) (concluding plaintiff "failed to carry its burden of proof that a broader injunction is necessary to protect the limited business interests that it has").

c

The non-disclosure clause provides that Dalpe "will not, during or after the term of [his] employment, disclose [Midwest's] confidential information to any other person or entity, or use [Midwest's] confidential information for [his] own benefit or for the benefit of another, unless [Midwest] expressly direct[s] [him] to do so." Agreement ¶ 2. There appears to be no dispute that Dalpe improperly possessed Midwest's confidential information. But there is no evidence in the record tending to show that he "disclosed" or

"used" the information "for [his] own benefit or for the benefit of another." *Id.* Midwest focuses in its briefs on the enforceability of the restrictive covenants and the fact that it and Laird are "direct competitors." *See* Mem. in Supp. at 15–19; Reply Mem. at 2–7. These assertions, even if accepted as true, do not establish that Dalpe breached this term or is likely to breach this term.

Dalpe testifies that he intended to use Midwest's information for two purposes—to determine the correct amount of his commission and "to ensure compliance with [his] non-compete obligations." Dalpe Decl. ¶¶ 34–35. As Midwest points out, there are questions to be asked regarding these asserted justifications. Mem. in Supp. at 11–12. Some of the information Dalpe emailed to himself seems irrelevant to determining the correct amount of his commission, First May Aff. ¶ 14, and Dalpe does not explain precisely how this information would enable him to "ensure compliance" with the non-compete covenants. Regardless of Dalpe's intent, the evidence at this stage tends to show that Dalpe did not use confidential information for his benefit or for the benefit of Laird. No evidence directly establishes this fact.[7] Dalpe has testified that he "ha[s] not disclosed any of Midwest's confidential information to any other person or entity, including Laird or Laird employees,"

---

[7]     Laird asserts that, "[o]f [its] approximate 350 customers in the Portland Market, less than ten are also customers of Midwest." First Jenkins Decl. ¶ 40. At the hearing, Midwest suggested that Dalpe or Laird likely used Midwest's customer list to reach this conclusion. If true, that would tend to show disclosure and use of Midwest's confidential information. Defendants denied this suggestion, asserting essentially that the overlap of Laird and Midwest's customers is something they knew independently of Midwest's confidential information. Perhaps because this issue surfaced for the first time at oral argument, it was not the subject of particularized advocacy, and it is not possible to conclude which account is more plausible.

and "ha[s] not used any of Midwest's confidential information for [his] own benefit or anyone else's benefit." Dalpe Decl. ¶¶ 37–38. Laird has testified that it "instructed Dalpe not to use any of Midwest's confidential information for the benefit of Laird or disclose any confidential information to Laird at any time for any reason." Second Jenkins Decl. ¶ 7. Dalpe has deleted all of Midwest's confidential information from all of his electronic devices and mediums and has retained a computer-forensics firm to maintain custody of his devices and to confirm his handling of the information. Nodes Decl. ¶ 4; Dalpe Decl. ¶ 36. At the hearing, Midwest alluded to an inevitable-disclosure theory of breach—that Dalpe cannot help but use confidential information he has committed to memory. *See Prime Therapeutics*, 354 F. Supp. 3d at 969 (discussing the inevitable-disclosure doctrine, a theory of trade-secret misappropriation). But without more, there is no likelihood of success on this theory of breach. *See also United Prods. Corp. of Am., Inc. v. Cederstrom*, No. A05-1688, 2006 WL 1529478, at *5 (Minn. Ct. App. June 6, 2006) ("Minnesota courts do not grant injunctive relief solely because a former employer presumes that disclosure and solicitation are inevitable.").

### 2

Midwest asserts misappropriation claims under the federal Defend Trade Secrets Act ("DTSA"), Minnesota Uniform Trade Secrets Act ("MUTSA"), Oregon Uniform Trade Secrets Act ("OUTSA"), and Washington Uniform Trade Secrets Act ("WUTSA"). *See* Compl. ¶¶ 88–89, 106–07. As the Parties recognize, it is appropriate to analyze these claims together because the statutes share functionally equivalent definitions of "trade secret," "misappropriation," and "improper means." Mem. in Supp. at 19–22; Mem. in

Opp'n at 23 & n.6; *see, e.g.*, *CPI Card Grp.*, 294 F. Supp. 3d at 807–08. These claims are appropriately addressed based on the meaning of the word "misappropriation." *Cf. Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 101 (D. Minn. 1992) ("An injunction may issue only where there is misappropriation or threatened misappropriation of trade secrets. Merely showing that [the employee] had knowledge of trade secrets is not enough." (citations omitted)); Mem. in Opp'n at 23–24 (focusing on the meaning of "improper means" and "disclosure" components of "misappropriation"). "Misappropriation" is defined in part as "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(B); Minn. Stat. § 325C.01, subd. 3(ii); Wash. Rev. Code § 19.108.010(2)(b); Or. Rev. Stat. § 646.461(2)(b).

The court's analysis in *CPI Card Group* is directly on point. In that case, the departing employee sent emails to himself containing alleged trade secrets. 294 F. Supp. 3d at 804. The court concluded that the employer was not likely to succeed on the merits of its trade-secret claim based on the misappropriation element, reasoning:

> [E]ven if this Court concluded that CPI is likely to establish that these emails contained trade secrets, CPI still faces an uphill battle to demonstrate that Dwyer or MPS misappropriated them. Although the Court questions Dwyer's candor in claiming that he forwarded these emails to himself for the benefit of CPI's customers, CPI has not presented any evidence showing that Dwyer forwarded these emails to MPS or otherwise personally used the information in a manner that is likely to constitute "misappropriation" under the applicable statutes. Absent evidence of use or disclosure, CPI would need to show "acquisition" by "improper means" . . . . Notably, Dwyer's Confidentiality Agreement did not *per se* prohibit him from forwarding emails to his personal email account. And absent this express prohibition—or again evidence of use or disclosure—the Court is hard-pressed to conclude that

> Dwyer's behavior falls under the definition of "improper means."

*Id.* at 809–10 (citations omitted).  The same logic applies here.  For the same reasons Midwest is not likely to succeed on its breach-of-contract claim for the "disclosure or use" of confidential information under the non-disclosure clause of the Agreement, Midwest has not carried its burden to demonstrate that "disclosure" or "use" is satisfied for purposes of its trade-secret claims.

There also is no evidence of threatened misappropriation or inevitable disclosure.  As in *Lexis-Nexis*, where a departing "sales manager" copied a company database and hundreds of emails with sensitive company documents, "[t]here is little evidence that [Dalpe] now possesses confidential [Midwest] information, apart from what he might retain in his memory."  41 F. Supp. 2d at 952, 959.  "A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury." *Int'l Bus. Mach. Corp.*, 941 F. Supp. at 101.  To summarize, then, even if Dalpe took trade secrets with him, Midwest has not demonstrated a likelihood of success on the element of "misappropriation," actual or threatened.  Discovery may reveal otherwise, but at this preliminary stage, the trade-secret claims do not justify issuance of a preliminary injunction.

3

For Midwest to succeed on its claim against Laird for tortious interference with contract, Midwest must show: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without

26

justification; and (5) damages." *CPI Card Grp.*, 294 F. Supp. 3d at 816 (quoting *E-Shops Corp. v. U.S. Bank Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012)). This tortious-interference claim, then, rises and falls on the success of Midwest's breach-of-contract claims. As discussed, the only breach-of-contract claim for which Midwest has arguably demonstrated a breach is the non-retention clause. But at this stage, there is no evidence suggesting that Laird knew about this specific contractual provision until after Dalpe announced his departure, when Midwest sent Laird a copy of Dalpe's Agreement. *See* Oberdorfer Decl. ¶ 2, Ex. A. There also is not in the record at this time evidence that Laird intentionally procured Dalpe to breach the Agreement. Midwest is not likely to succeed on the merits of this claim.[8]

## B

The second *Dataphase* factor is irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "*likely* in the absence of an

---

[8]     Midwest argues that it "has a high likelihood of prevailing on the merits of all of the claims in the Complaint, not simply the [three] outlined" in its brief. Mem. in Supp. at 15 n.3. But Midwest has the burden of showing it is entitled to a preliminary injunction, and it has not carried that burden for its remaining causes of action. *See Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1184 (8th Cir. 2019) (affirming the district court's denial of preliminary injunctive relief where plaintiff "alleged ten claims in its complaint" but "rather than explaining why it was likely to prevail on the merits of those claims, it devoted most of its memorandum . . . to chronicling . . . alleged misdeeds, regardless of their relevance to the motion"); *see also Seaton v. Wiener*, 22 F. Supp. 3d 945, 949 (D. Minn. 2014) ("The party requesting the injunctive relief bears the 'complete burden' of proving all of the [*Dataphase*] factors." (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987))).

injunction," *Winter*, 555 U.S. at 22 (citations omitted), "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation and internal quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.*, 346 F.3d at 844 (citations omitted); *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

The Agreement's inclusion of a term acknowledging the possibility of irreparable harm in the event of a breach does not establish a likelihood of irreparable harm here. *See Winter*, 555 U.S. at 22 (rejecting the possibility standard for irreparable harm as "too lenient"). The Agreement provides: "I also understand that any unauthorized use or disclosure of [Midwest's] confidential information, or any violation of my obligation not to solicit your customers or employees or compete with you, would seriously harm [Midwest's] business and *cause monetary loss that would be difficult, if not impossible, to measure*." Agreement at 1 (emphasis added). Courts may consider such stipulations as evidence of irreparable harm. *See, e.g.*, *CPI Card Grp.*, 294 F. Supp. 3d at 817. But conversely, the particular stipulation in the Agreement seems contingent on proving a breach of the non-disclosure, non-compete, or non-solicitation clauses, for which Midwest is not likely to carry its burden. Moreover, the Second Circuit and Southern District of

New York cases Midwest cites for the proposition that "[c]ourts have frequently treated such express acknowledgements as strong evidence of irreparable harm," Mem. in Supp. at 24, are at least tempered by a recent decision of the Minnesota Supreme Court recognizing that "parties do not have the capacity to direct the court's exercise of equitable powers," and that a private employment agreement "cannot resolve the legal questions that require an exercise of judicial authority," *St. Jude Med., Inc. v. Carter*, 913 N.W.2d 678, 684 (Minn. 2018) ("The decision to exercise a court's equitable authority . . . rests with a judge, not in drafting decisions made in contract negotiations. . . . The district court was not required to find that [the] remedy at law would be inadequate, nor that irreparable harm would result.").

The record does not contain evidence sufficient to establish a likelihood of irreparable harm. Midwest has identified several categories of harm that it contends are irreparable through damages, such as the loss of customer goodwill and confidential information. Mem. in Supp. at 25 ("Without an injunction, Midwest faces irreparable harm in the form of loss of customer relationships and control of its confidential and proprietary information. These losses are impossible to quantify . . . ."). The "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citation omitted). But Midwest has framed this risk of irreparable harm to customer goodwill in general, "conclusory terms and without citation to evidence." *Mgmt. Registry, Inc. v. A.W. Cos.*, No. 17-cv-5009 (JRT/FLN), 2018 WL 461132, at *6 (D. Minn. Jan. 16, 2018), *aff'd*, 920 F.3d 1181 (8th Cir. 2019). For example, Midwest says Dalpe was in a "unique

position" and had "valuable relationships" with "significant goodwill." Mem. in Supp. at 25 (containing no citations to the record). These assertions, without more, do not show a likelihood of irreparable harm that, in turn, would justify issuing a preliminary injunction.

An independent review of the record reveals limited detail about the strength and significance of Dalpe's customer contacts and connections. *See* Weinberg Aff. ¶¶ 8–10, 13–15. Although Dalpe may have "regularly" interacted with customers, *id.* ¶ 14, there is no evidence that he was the "face of the company" or that he had a "personal hold" on customer goodwill. *Cf. Advance Contract Equip.*, 2015 WL 5089167, at *3 (affirming district court's finding of irreparable harm where the company's CEO testified in an affidavit that a salesman "was the second highest grossing salesperson company wide" and customers "kn[ew] him as the face of [the] company"); *Lisec Am., Inc. v. Wiedmayer*, No. 05-cv-1082 (JRT/JJG), 2005 WL 3143985, at *5 (D. Minn. Nov. 23, 2005) ("[W]hile as a salesman Wiedmayer came into contact with customers, it is not clear from the record how much of a 'personal hold on the good will' . . . Wiedmayer actually held. . . . [I]t is not clear that he became so identified with the good will and reputation of Lisec America such that the company will suffer irreparable harm from [him] continuing to work in this market." (citation omitted)). At bottom, Dalpe's role as Northwest Sales Manager was managerial. The evidence at this stage seems to show that he acted as the intermediary between ground-level sales representatives and higher-level management. *See* Weinberg Aff. ¶¶ 6, 13, 17.

Midwest cited to *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978), at the hearing for the proposition that even the most honest employees cannot help

but use confidential information they have committed to memory. In *Andreadakis*, the Eighth Circuit found irreparable harm despite the new employer having "specifically instructed [the employee] not to disclose any trade secrets" and the employee claiming he had not disclosed any trade secrets or confidential information. *Id.* at 1269–70. The court observed that "such information may be disclosed in more subtle ways than outright disclosure" and reasoned that it was "unrealistic" to expect that the employee had not utilized confidential information, and "equally unrealistic" to expect that it would not give the new employer "a significant advantage over its significantly smaller competitor." *Id.* at 1270.

But *Andreadakis* is distinguishable and does not establish that irreparable harm is likely here. In *Andreadakis*, the departing employee left to work on "an identical product"—a "flat panel gas discharge display device used to display information from a computer to a computer user." *Id.* at 1266, 1270. True, Laird sells some of the same products that Midwest offers, but the inevitability of disclosure is different for a sales employee than an engineer or creative professional who is designing that very product. *See also Midwest Urologic Stone Unit Ltd. P'ship v. Domina*, No. 01-cv-212 (JRT/FLN), 2001 WL 228447, at *3 (D. Minn. Feb. 22, 2001) (distinguishing *Andreadakis* because "[t]here, the defendant made a much stronger showing that plaintiff's unbridled access to the research and development methods and manner of designing defendant's core product would cause it irreparable harm"). It also is significant that Dalpe and Laird have provided sworn assurances that mitigate the risk of irreparable harm. *See, e.g.*, *Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-cv-567 (NEB/LIB), 2019 WL 1238835, at *6 (D. Minn.

Mar. 18, 2019) ("[A]ny threats [of misappropriation] by Landsverk appear to be empty. He has returned the server and all IPS devices . . . and has made explicit promises not to use any of IPS's information. And there is no evidence he has used any of IPS's information. . . . The Court therefore finds IPS will not be irreparably harmed absent injunctive relief.").

C

The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015) (citation omitted). Midwest says this factor "weighs heavily" in its favor because "[w]ithout an injunction, Dalpe will be free to directly or indirectly compete with Midwest . . . and misuse the confidential information that he stole from Midwest, which remains in his possession." Mem. in Supp. at 25–26. Defendants argue that this factor weighs in their favor because forbidding Dalpe from working at Laird "would effectively halt operations at Laird's Portland location" and inhibit the company's planned growth into fabricating and processing plastics. Mem. in Opp'n at 30–31; First Jenkins Decl. ¶¶ 57–61. As with many cases, the balance of harms does not clearly favor any party. There are certainly risks for Midwest in the absence of a preliminary injunction. At the same time, the issuance of an injunction would affect Dalpe's ability to earn a living and Laird's ability to operate its Portland branch, even in aspects that have no competitive relationship to Midwest.

D

Midwest says "[t]he public interest is best served by upholding valid covenants not to compete," Mem. in Supp. at 27, while Defendants say "[p]ublic policy more vehemently favors *not* enforcing overbroad, unduly restrictive non-competes, Mem. in Opp'n at 32 (quoting *Marvin Lumber*, 2015 WL 5719502, at *10). *See also Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 1001 (D. Minn. 2013) ("While the public interest does favor protecting confidential information and enforcing contracts, it also favors competition."). As with many non-compete cases, "[t]his case implicates primarily business interests, not public rights." *Prime Therapeutics*, 354 F. Supp. 3d at 975 (citation omitted). Realistically, Dalpe's presence or absence at Laird is not going to "seriously affect the competition in the industry." *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1095 (D. Minn. 1981). This factor is therefore neutral.

III

Along with its motion for temporary restraining order, Midwest filed a motion to expedite discovery. ECF No. 10. The general rule is that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." Fed. R. Civ. P. 26(d)(1). But some courts have found that expedited discovery is appropriate in limited circumstances and for limited rationales, such as "when a plaintiff seeks injunctive relief" because of "the expedited nature of injunctive proceedings." *ALARIS Grp., Inc. v. Disability Mgmt. Network, Inc.*, No. 12-cv-446 (RHK/LIB), 2012 WL 13029504, at *2 (D. Minn. May 30, 2012) (quoting *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996)).

The purpose of expedited discovery in the context of a temporary restraining order or preliminary injunction is for "[f]urther development of the record before the preliminary injunction hearing," which "better enable[s] the court to judge the parties' interests and respective chances for success on the merits." *Edudata Corp. v. Sci. Computs., Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984). This purpose is not served here. Midwest's motion for a temporary restraining order was treated as a preliminary-injunction motion, and the Parties were able to create a relatively robust record without discovery. *Cf. id.* at 1086, 1089 (granting a motion for expedited discovery in the course of granting a temporary restraining order just two days after the case was filed and scheduling a preliminary-injunction hearing for three weeks later). There are no plans at this time to hold another hearing. *See ALARIS Grp.*, 2012 WL 13029504, at *3 (collecting cases denying discovery motions "where there was in fact no pending motion for preliminary injunction").

Alternatively, expediting discovery can be "a way to prevent irreparable harm while at the same time granting a motion for a preliminary injunction." *Id.* at *4. This purpose is not served here, either. Although Midwest contends that there is a risk of irreparable harm for purposes of the preliminary injunction, there is not the same risk of irreparable harm for purposes of its motion for expedited discovery. The Parties have already implemented litigation holds. There is no evidence suggesting a risk of spoliation. It is true that Dalpe deleted the emails containing Midwest's confidential information, but Midwest knows already what documents and information Dalpe emailed to himself, First May Aff. ¶¶ 12–13, and Midwest asked specifically that this information be destroyed as part of its pre-suit communications with Defendants, Oberdorfer Aff. Ex. C at 2. It also is

true that Dalpe refused to turn over his personal electronic devices to Midwest, but those devices are not in jeopardy. They are in the custody of a third-party computer-forensics firm. *See* Dalpe Decl. ¶ 36; *id.* Ex. A [ECF No. 33-1]. A threat of spoliation does not favor granting Midwest's motion.

Importantly, as acknowledged at the hearing, Laird and Dalpe have now answered the complaint. ECF Nos. 39, 40. And Magistrate Judge Steven E. Rau has since issued an order scheduling a Rule 16 pretrial conference on June 12, 2019. ECF No. 45 at 2. This will trigger the discovery process under Rule 26. *See* Fed. R. Civ. P. 26(f)(1) (providing that "the parties must confer as soon as practicable—and in any event at least 21 days before a scheduling conference is to be held or a scheduling order is due under Rule 16(b)"); Fed. R. Civ. P. 26(a)(1)(C) (requiring initial disclosures "at or within 14 days after the parties' Rule 26(f) conference"); *see also* Fed. R. Civ. P. 26(d)(2)(A) (providing for early Rule 34 requests to be made "[m]ore than 21 days after the summons and complaint are served on a party").

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.     Plaintiff's Motion for Temporary Restraining Order [ECF No. 3] is **DENIED**.

2.     Plaintiff's Motion to Expedite Discovery [ECF No. 10] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 10, 2019                              s/ Eric C. Tostrud
                                                                Eric C. Tostrud
                                                                United States District Court